# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *In re Parentage of J.W.*, 2013 IL 114817

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* PARENTAGE OF J.W., a Minor (Steve Taylor, Appellee, v. Amy Wills-Merrill (Jason Wills, Appellant)). |
| Docket No. | 114817 |
| Filed | May 23, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Parentage Act provides that, after a finding of biological fatherhood, a visitation request is evaluated in accordance with the Marriage Act; and the Proper provision thereof to apply is section 602, which lists factors to consider in determining the best interests of the child, rather than section 607(a), which gives a noncustodial parent a rebuttable presumption of reasonable visitation absent a showing that this would endanger the child. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Vermilion County, the Hon. Karen E. Wall, Judge, presiding. |
| Judgment | Appellate court judgment reversed.<br>Circuit court judgment affirmed. |

Counsel on
Appeal

David Sotomayor, of Orland Park, for appellant.

James A. Martinkus, of Erwin, Martinkus & Cole, Ltd., of Champaign, for appellee.

Robert F. Harris, Kass A. Plain and Christopher Williams, of the Office of the Cook County Public Guardian, of Chicago, for *amicus curiae* Cook County Public Guardian.

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Diane Potts, Deputy Attorney General, of Chicago, of counsel), for *amicus curiae* Illinois Department of Healthcare and Family Services.

Camilla B. Taylor, of Chicago, for *amicus curiae* Lambda Legal Defense and Education Fund, Inc.

Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

¶ 1    The issue in this appeal concerns the proper standard to be applied when a biological father seeks visitation privileges after a determination of parentage under section 14(a)(1) of the Illinois Parentage Act of 1984 (the Parentage Act) (750 ILCS 45/14(a)(1) (West 2010)). The circuit court of Vermilion County applied the best interests of the child standard set forth in section 602 of the Illinois Marriage and Dissolution of Marriage Act (the Marriage Act) (750 ILCS 5/602 (West 2010)), and found that it was not in the minor child's best interests to have contact with her biological father at this time. The appellate court reversed, concluding that section 607(a) of the Marriage Act (750 ILCS 5/607(a) (West 2010)) is the relevant standard to be considered, entitling a noncustodial parent to a rebuttable presumption of reasonable visitation unless it can be shown that visitation would seriously endanger the child's physical, mental, moral or emotional health.

¶ 2    For the reasons that follow, we hold that in a proceeding to determine visitation privileges under section 14(a)(1) of the Parentage Act, the initial burden is on the noncustodial parent to show that visitation will be in the best interests of the child pursuant to section 602 of the Marriage Act. We therefore reverse the judgment of the appellate court.

¶ 3                                    BACKGROUND

¶ 4        In the summer of 2001, Amy Wills-Merrill and Jason Wills began an intimate relationship. During that same summer, unbeknownst to Jason, Amy had a one-time sexual encounter with Steve Taylor. Amy subsequently became pregnant and had a child, J.W., who was born on April 15, 2002. Amy assumed that the child's father was Jason. Jason signed a voluntary acknowledgment of paternity and was listed as the father on J.W.'s birth certificate.

¶ 5        Amy and Jason married in March 2003, when J.W. was almost a year old. The couple later divorced in 2006. They entered into a marital settlement agreement, which was incorporated into the dissolution judgment. Pursuant to the terms of their agreement, which identified Jason as J.W.'s father, Amy had sole custody of J.W., and Jason had visitation rights and child support obligations.

¶ 6        After the divorce, J.W. experienced a lot of chaos in her life. In September 2008, Amy married Joe Merrill, who had three children from a previous relationship. Meanwhile, that summer, Steve viewed a picture of J.W. on Amy's social media site, while seeking out old acquaintances. He saw a resemblance in J.W. and contacted Amy regarding the possibility that he was J.W.'s biological father. Thereafter, Steve, Amy, and J.W. submitted to DNA testing. About one week prior to Thanksgiving 2008, DNA results indicated Steve was J.W.'s biological father.

¶ 7        After receiving the DNA results, Amy temporarily separated from Joe, moved with J.W. from Catlin, Illinois, to Potomac, Illinois, where Steve resided, and placed J.W. in school there. Amy informed Jason that he was not the biological father. Over the holiday season, J.W. was introduced to Steve and his extended family and spent time with them between Thanksgiving 2008 and January 2009. J.W. was initially introduced to Steve and his family as friends, but was subsequently told by Amy at the end of December 2008 that Steve was her "real dad." Amy never discussed with J.W. her understanding of her relationship to Steve.

¶ 8        In January 2009, Jason sought a temporary modification of custody or, alternatively, an order prohibiting Amy from cohabiting with any male not her lawful spouse while having physical custody of J.W. Amy and Jason agreed to modify the judgment of dissolution. Under the modified order, Amy was prohibited from residing or cohabiting with Steve, prohibited from allowing J.W. to have any contact with Steve, and prohibited from promoting the existence of any parent-child relationship between Steve and J.W. until further order of the court.[1] Neither Steve nor his counsel was present or a party to that hearing in the dissolution proceeding. Thereafter, on February 4, 2009, Steve filed a verified petition to determine the existence of a parent-child relationship under the Parentage Act (750 ILCS 45/1 *et seq.* (West 2008)). In addition to establishing his paternity, Steve sought joint custody

_____

[1]The order is entitled "order on January 9, 2009, hearing." According to the record, the order was entered and filed on April 17, 2009. A transcript of the January 9 hearing has not been made part of the record on appeal.

and visitation privileges pursuant to section 14(a)(1) of the Act.[2] 750 ILCS 45/14(a)(1) (West 2008). Jason did not contest Steve's petition to establish parentage, but sought a best-interests hearing on the issue of Steve's right to visitation with J.W. At that time, J.W. was almost seven years old.

¶ 9        On April 17, 2009, the trial court granted Steve's motion to consolidate the dissolution proceeding between Amy and Jason with his parentage action. The record reflects that the no-contact order was entered at that time. Steve's motion to appoint a guardian *ad litem* (GAL) for J.W. was also granted. Steve then filed a motion to vacate, modify, or reconsider the no-contact order. He argued that the order effectively barred him from any contact with J.W. in contravention of the relevant standards in determining his visitation rights under the Parentage Act. The trial court denied his motion. Meanwhile, a month after Steve filed his petition to determine paternity, Amy reunited with Joe and his three children. Amy and Joe later moved to Danville and had a child together.

¶ 10       On September 9, 2009, after additional DNA testing, the trial court entered a judgment declaring Steve to be the biological father of J.W. After an unsuccessful attempt at mediation, the court held a hearing on Steve's right to visitation with J.W. Dr. Marilyn Frey, a clinical psychologist, was appointed by the trial court to conduct an evaluation to determine whether visitation between Steve and J.W. was in J.W.'s best interests. Dr. Frey testified that in August and September of 2010, she interviewed Steve, Amy, and Jason and observed J.W. interact with Jason and Amy. Dr. Frey testified at the hearing consistently with her evaluation report. She stated that J.W. was bonded with both Amy and Jason, and that J.W. indicated that she enjoyed spending time with Jason and his son from a subsequent relationship.

¶ 11       Dr. Frey acknowledged that Steve and J.W. had some sort of a relationship at one time, but recommended that it would not be in J.W.'s best interests to have contact with Steve at this time. It was Dr. Frey's opinion that J.W. did not have the abstract reasoning skills at her age to understand Steve's relationship to her or how Jason was not her "biological" father, and that the information could seriously impact her relationship with her mother. Dr. Frey also believed that introducing another father figure into J.W.'s life could put J.W. at risk emotionally, socially and academically, affect her sense of adequacy with her peers, and create a fear of abandonment. She was concerned about J.W. being exposed at eight years old to information regarding her relationship to Steve in such a small rural community. In forming the basis of her opinions, Dr. Frey used dolls and teddy bears and had J.W. identify them with a person from her family. During these exercises, J.W. identified numerous extended family members, but did not mention Steve as part of her family.

¶ 12       Dr. Frey testified that the basis of her predictions of risk were based, in part, upon the developmental theories of Erikson and Piaget, and 44 years of clinical experience. She acknowledged that she did not have "hardcore evidence" or research that involvement with Steve would have a negative impact on J.W. Dr. Frey also acknowledged that at the time she interviewed J.W., J.W. had already been introduced to another father figure, her new

---

[2]The record reflects that after mentioning it in his petition, Steve never pursued joint custody of J.W.

stepfather, Joe, and that she did not exhibit any of the potential risks Dr. Frey expressed as concerns. However, Dr. Frey stated that the situation with a stepfather was not comparable. She acknowledged that it was possible that J.W. could have a good relationship with Steve and could receive the benefits of spending time with Steve's extended family. Dr. Frey also left open the possibility that at some time in the future it may be in J.W.'s best interests to be advised about Steve. In her report, Dr. Frey stated that "[o]nly with time and observation of and interactions with [J.W.] will it be possible to determine at what age she should be told about Steve."

¶ 13 Steve presented the testimony of Dr. Judy Osgood, a clinical psychologist retained by him to review Dr. Frey's report. Dr. Osgood reviewed the report and interviewed Steve in May 2011. Dr. Osgood testified that she believed that J.W. and Steve had spent a significant amount of time together and that it would be detrimental for J.W. to miss out on contact with Steve and his extended family, who showed J.W. love and affection. Dr. Osgood believed it was in J.W.'s best interests to resume contact with her biological father. In her opinion, Steve did not present any risk factors which would create any danger to J.W.

¶ 14 Dr. Osgood stated that, based upon the fact that J.W. was told Steve was her biological father, she believed that J.W. would question why he had now disappeared out of her life. It was her opinion that if J.W. could at least maintain a stable relationship with her biological father, that could be a constant in her life, where there had been a lot of inconsistency and instability. Dr. Osgood recommended that both J.W. and Steve meet with a counselor to assist J.W. in understanding that she was not going to lose her relationship with Jason, and believed that there could be a gradual progression of contact with Steve.

¶ 15 Dr. Osgood was critical of Dr. Frey for failing to observe J.W. and Steve together and believed that this interaction was a significant missing piece of Dr. Frey's evaluation. She did not agree that merely because J.W. did not mention Steve in the session with Dr. Frey that there was no bond between them. It was Dr. Osgood's opinion that the testing reflected the people that were currently in J.W.'s life, given the no-contact order, but did not mean that there was not a bond between them at one time, or that J.W. did not know her biological father. She believed it would be shortsighted to conclude that there was no bond. She found it significant that, although Steve was not allowed to continue contact with his daughter due to the court order, Steve's sister continued to provide child care to J.W. until March 2010, when J.W. moved to Danville. Dr. Osgood acknowledged that she did not know what J.W. currently understood about her relationship to Steve.

¶ 16 Dr. Osgood explained that she was not retained to engage in a best-interests visitation evaluation. Rather, she characterized her role as providing a psychological report on Steve and providing an opinion as to his "position and credibility" in requesting visitation with J.W. She was not provided with the GAL's report and did not have an opportunity to interview or evaluate J.W. She would have liked to have observed J.W. interact with Steve, but believed that the no-contact order prohibited her from observing them together. She further stated that she was not requested by counsel to evaluate them together.

¶ 17 Steve testified that he was employed with the railroad and resided in Potomac, Illinois, with his father. He has no other children and is not married. He has three sisters, who are all

married with children. Upon finding out that J.W. was his biological child, he and his extended family were introduced to J.W. and engaged in many activities with her during the period from Thanksgiving of 2008 until January of 2009, when the court prohibited Amy from promoting a relationship between him and J.W. He introduced several photographs of their time together. Steve stated that he recognized that J.W. had many people in her life that loved her. He did not want to take away Jason's right to visitation or disturb the relationship J.W. had developed with Jason and with her current stepfather, Joe. Steve testified that he wanted to be a part of J.W.'s life, to get to know her, to watch her grow up, to teach her how to do certain things, and be there to support her. He further testified that he had provided financial support for J.W.'s care.

¶ 18    Stephanie Bishop, Steve's sister, testified that she started babysitting for J.W. after school in December 2008, when J.W. moved to Potomac and continued to provide child care until March 2010, when J.W. moved to Danville. Bishop and her sisters' families were originally introduced to J.W. as Amy's friends, and then, after Christmas 2008, they were referred to by J.W. as aunts and cousins and engaged in several activities together. Stephanie heard J.W. refer to Steve as "daddy" on many occasions.

¶ 19    Clarendin McCarty was J.W.'s first-grade teacher while she lived in Potomac from December 2008 until May 2009. McCarty knew Steve from high school and was friends with one of Steve's sisters. McCarty testified that J.W. was very enthusiastic, academically a good student, and good with transitions. McCarty did not observe any anger or depression. J.W. spoke about two dads, "daddy Steve" and "daddy Jason," and referred to Steve as her "real dad." In February 2009, Steve came to a Valentine's Day party at the school. Steve's two nephews were also in the same class as J.W. at the school.

¶ 20    After hearing the evidence, the trial court allowed the GAL an opportunity to comment on whether the evidence presented at the hearing had changed his recommendations previously set forth in his report filed in June 2009. The report was admitted into evidence at the hearing. Therein, the GAL indicated that he met with J.W. in June 2009. At that time, he expressed concern with regard to all of the changes in J.W.'s life, including the divorce, her mother's remarriage to Joe, being taken abruptly out of her school, and being removed from her home and placed with a new set of children in a new school. The GAL noted that during the meeting with J.W. in June 2009, J.W. did not include Steve as someone in her family, when given an opportunity to tell him about her family. When asked about what was new in her life or if there were any surprises, J.W. did not mention Steve in her life. When asked about her babysitter, if the babysitter had any brothers, and if Steve was the babysitter's brother, J.W. responded that Steve was the babysitter's friend and her mother's friend.

¶ 21    The GAL further found that J.W. had a very strong bond with Jason. The GAL did not believe that Steve posed any serious endangerment to J.W., but was concerned that introducing him into J.W.'s life could detrimentally impact her stability. He recommended that it was not in J.W.'s best interests to be introduced to Steve at this stage in her life. However, if the court were to order visitation, he believed it should be gradual and with extensive counseling. At the hearing, he acknowledged that his opinions were based upon his perspective, without having a degree in psychology. He essentially deferred to the

opinions and recommendations made by Dr. Frey, but felt even stronger about his recommendation after hearing Dr. Frey's testimony.

¶ 22    Amy did not testify at the hearing.

¶ 23    The trial court determined that based upon this court's precedent, Steve had the burden of proving that visitation would be in J.W.'s best interests by a preponderance of the evidence. The court applied the "best interests" factors as set forth in section 602 of the Marriage Act (750 ILCS 5/602 (West 2010)). Specifically, the court found the following factors applicable to the circumstances: the wishes of the child's parent or parents as to custody; the interaction and interrelationship of the child with the parent or parents, siblings, and any other person who may significantly affect the child's best interests; the child's adjustment to home, school, and the community; and the mental and physical health of everyone involved.

¶ 24    The trial court considered that Steve sincerely sought to establish a close parent-child relationship and desired visitation. The court indicated that Amy's desire was unclear, having taken conflicting positions. At the time of the GAL report, she seemed desirous of visitation, but at the time of trial, she did not support Steve's efforts to obtain visitation. The court also noted Jason's opposition to Steve's visitation with J.W.

¶ 25    With respect to the experts, the court found Dr. Frey's opinions more persuasive than those of Dr. Osgood. The court noted that Dr. Frey's observations of J.W. did not support an existing close relationship between Steve and J.W. and that Dr. Frey's explanations regarding J.W.'s inability to process Steve's relationship to her and the increased risk it posed were credible. The court further found Dr. Osgood's opinions not persuasive because she did not perform any independent testing of J.W. and relied instead upon her impressions related by Steve of a close and loving relationship.

¶ 26    The court indicated that the most weight was given to what J.W. perceived at the time of her evaluation. The court found that based upon Dr. Frey's testing and the GAL interview, J.W. did not understand Steve to be her father. She identified Jason as her father because of their long-standing loving relationship. The court noted that Steve had no regular contact with J.W. since January 2009 and his involvement was limited to a five- or six-week period of time, where much of that time he was thought to be a family friend. The court was concerned about the increased risk of harm if the court disregarded J.W.'s current lack of understanding of the situation. Based on these findings, the court held that it was not in J.W.'s best interests for Steve to be introduced or reintroduced into her life at this time.

¶ 27    In ruling, the court also considered Steve's argument that under section 602(c) of the Marriage Act there is a presumption that "the maximum involvement and cooperation of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child." 750 ILCS 5/602(c) (West 2010). The court found that the presumption was not relevant to the facts and circumstances presented here, and that even if the presumption applied, it was rebutted by Dr. Frey's testimony that Steve's involvement was not in J.W.'s best interests at this time.

¶ 28    The court denied Steve's petition for visitation, and ordered that all parties and their families not promote the existence of a parental relationship between Steve and J.W. The

court additionally ordered that J.W. be evaluated annually "to determine [her] understanding of the identification of her father." The order provided that if during the annual evaluation, J.W. demonstrates "an understanding that [Steve] is her father," all parties shall be notified within 10 days. Issues with regard to child support were reserved.

¶ 29　　Thereafter, the trial court entered an agreed order on Amy's petition to set child support. The parties agreed that Steve would pay Amy child support for J.W. in the amount of $300 per month in addition to an arrearage in child support of $4,500. The order noted that although the amount deviated from the guidelines, it was reasonable and appropriate under the unique circumstances of this case because Jason also pays child support to Amy for J.W.

¶ 30　　On appeal, Steve argued that the trial court erred in holding that the burden of proof is on the noncustodial parent seeking visitation under the Parentage Act to establish that visitation is in the best interests of the minor child. He maintained that as a biological parent he enjoyed a presumption, entitling him to visitation under section 607(a) of the Marriage Act absent evidence of serious endangerment to the child. 2012 IL App (4th) 120212, ¶¶ 35-36. The appellate court considered the conflicting appellate court case law on the appropriate standard, including its own prior Fourth District case of *Department of Public Aid ex rel. Gagnon-Dix v. Gagnon*, 288 Ill. App. 3d 424, 428 (1997), which rejected the application of section 607(a) as the relevant standard under the Parentage Act. *Id.* ¶ 34. The appellate court then noted that other appellate court decisions had disagreed with *Gagnon*. Relying on those cases, the court concluded, without engaging in any statutory construction of its own, that section 607(a) of the Marriage Act is the relevant standard to be considered when determining visitation rights in cases brought under the Parentage Act or the Marriage Act. *Id.* ¶¶ 35-39.

¶ 31　　However, in reaching its conclusion, the appellate court emphasized the factual circumstances of this case, highlighting that there was "no delay on Steve's part in attempting to establish a healthy, meaningful relationship with J.W." *Id.* ¶ 41. The court stated, "[w]e are confident trial courts can sort out those cases such as *Gagnon*, where a biological father sought visitation after no contact for eight years, and [cases] where a presumed father eagerly sought continued visitation and contact with the son born during his marriage to the child's mother." *Id.* ¶ 39. Thus, the court seemed to suggest that whether the presumption in section 607(a) is relevant under the Parentage Act is not a question of law but, rather, depends upon the facts and circumstances of the case.

¶ 32　　The appellate court held that Steve was entitled to reasonable visitation rights unless visitation would seriously endanger J.W.'s physical, mental, moral, or emotional health. *Id.* ¶ 40. The court found that the evidence did not support a finding of serious endangerment. Accordingly, it reversed and remanded with directions for the trial court to create and implement a reasonable visitation plan. *Id.* ¶ 52.

¶ 33　　We subsequently allowed Jason's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). Additionally, we allowed the *amicus curiae* briefs of the Cook County public guardian, the Lambda Legal Defense and Education Fund, Inc., and the Illinois Department of Healthcare and Family Services. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

ANALYSIS

¶ 35                                          I

¶ 36        The question presented by this appeal is a narrow one: What is the proper standard to be applied when a biological father seeks visitation privileges after a determination of parentage under section 14(a)(1) of the Parentage Act (750 ILCS 45/14(a)(1) (West 2010)). This question requires us to construe section 14(a)(1) and its interrelationship to the provisions in the Marriage Act referring to a noncustodial parent's entitlement to reasonable visitation under section 607(a) (750 ILCS 5/607(a) (West 2010)).[3]

¶ 37        Familiar principles of statutory construction guide our analysis. Our primary objective is to give effect to the legislature's intent. *In re C.C.*, 2011 IL 111795, ¶ 30. In determining that intent, we may properly consider the statutory language, the reason and necessity for the law, the evils to be remedied and the statute's ultimate purpose and objective. *Carter v. SSC Odin Operating Co.*, 2012 IL 113204, ¶ 37. When construing the language of the statute, we must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation. *Id.* Our review is *de novo*. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 21.

¶ 38        The Parentage Act establishes a comprehensive scheme for determining paternity and for establishing custody, visitation, and child support obligations in connection with a judgment of paternity. Under the Act, once paternity is established, section 14(a)(1) provides in pertinent part that the judgment "*may* contain provisions concerning *** visitation privileges with the child." (Emphasis added.) 750 ILCS 45/14(a)(1) (West 2010). Decisions regarding visitation

> "shall [be] determine[d] in accordance with the relevant factors set forth in the Illinois Marriage and Dissolution of Marriage Act [750 ILCS 5/101 *et seq.*] and any other applicable law of Illinois, to guide the court in a finding in the best interests of the child. In determining custody, joint custody, removal, or visitation, the court shall apply the relevant standards of the Illinois Marriage and Dissolution of Marriage Act, including Section 609." 750 ILCS 45/14(a)(1) (West 2010).

Thus, section 14(a)(1) expressly provides that an award of visitation is discretionary, directs the trial court to make a "finding in the best interests of the child," and to apply the "relevant standards" of the Marriage Act.

¶ 39        We have previously held that under the express terms of the Parentage Act, a judgment of paternity does not automatically entitle a biological father to visitation. Rather, the "privilege" of visitation is subordinate to the best interests of the child. *J.S.A. v. M.H.*, 224 Ill. 2d 182, 211 (2007) ("[T]he right of a biological father to establish paternity to a child

---

[3]At the outset, we note that Jason has never challenged Steve's standing to establish the existence of a parent-child relationship, and no attempt has been made or order entered disavowing Jason's parental rights either under the Parentage Act or under the judgment of dissolution. Accordingly, for purposes of this appeal, we make no determination with regard to either party's standing, or as to Jason's continued legal status as a parent. Those issues are not presently before this court.

born to a marriage does not also mean that the legal rights flowing from the parent and child relationship are automatically conferred."); *In re Parentage of John M.*, 212 Ill. 2d 253, 264-65 (2004).

¶ 40     In *J.S.A.*, this court reiterated that "the Parentage Act specifically provides in section 14(a)(1) that decisions regarding the involvement of the biological father in the life of the child are to be governed solely by what is in the child's best interests." *J.S.A.*, 224 Ill. 2d at 211. We explained that " 'even though paternity may be established upon the filing of a petition pursuant to section 7(a), any parental rights of the biological father, such as the right to have custody of, or visitation with, the child, shall not be granted unless it is in the child's best interest.' " *Id.* at 212 (quoting *Parentage of John M.*, 212 Ill. 2d at 265). Accordingly, under the statutory scheme, after a declaration of paternity, the court is "required to conduct a best-interests hearing to determine whether, and to what extent, the natural father may exercise any rights with respect to the child." *Id*. We further held that "both parties may introduce evidence either in support of, or in opposition to, the natural father being granted parental rights to his biological child." *Id*.

¶ 41     As this court has long emphasized, the best interests of the child is the "guiding star" by which all matters affecting children must be decided. *Nye v. Nye*, 411 Ill. 408, 415 (1952). Nevertheless, we have not specifically been called upon to consider which provisions of the Marriage Act are "relevant" to guide the court in a finding in the best interests of the child in the context of a paternity action where visitation is at issue.

¶ 42     Initially, we observe that our appellate court has previously ruled inconsistently on this issue. Some cases have applied the best-interests provisions set forth in section 602 of the Marriage Act, which lists several nonexclusive factors the court is to consider and weigh in making any custody determination. 750 ILCS 5/602(a) (West 2010). Other cases have applied the visitation provisions of section 607(a), which presumes visitation is in the best interests of the child absent evidence of serious endangerment. Compare *Wittendorf v. Worthington*, 2012 IL App (4th) 120525; *Department of Public Aid ex rel. Gagnon-Dix v. Gagnon*, 288 Ill. App. 3d 424, 428 (4th Dist. 1997) (finding that the reference in section 14(a)(1) of the Parentage Act to the Marriage Act was a reference to section 602 and did not incorporate section 607(a)), with *Jines v. Jurich*, 335 Ill. App. 3d 1156, 1162 (5th Dist. 2002) (the plain language of the Parentage Act requires courts to use the standards for visitation outlined in section 607(a) of the Marriage Act); *In re Parentage of Melton*, 314 Ill. App. 3d 476, 480 (1st Dist. 2000) ("the factors for determining visitation privileges in section 607(a) *** guide visitation determinations under the Parentage Act"); *Wenzelman v. Bennett*, 322 Ill. App. 3d 262, 265 (2001) (where a prior parent-child relationship existed, a presumption existed in favor of the biological parent for visitation and parent was not required to prove visitation was in the child's best interests).

¶ 43     Steve maintains that the appellate court correctly concluded that section 14(a)(1) incorporates the visitation provisions of section 607(a) of the Marriage Act as the "relevant" standard in considering visitation privileges arising out of a paternity action. Section 607(a) of the Marriage Act provides:

        "[a] parent not granted custody of the child is entitled to reasonable visitation rights

unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health." 750 ILCS 5/607(a) (West 2008).

Thus, under section 607(a) of the Marriage Act, the General Assembly has established a presumption that it is in the best interests of the child to have reasonable visitation with a noncustodial parent, and the burden is on the custodial parent to prove that visitation would seriously endanger the child. *In re Marriage of Fields*, 283 Ill. App. 3d 894, 905 (1996). The "serious endangerment" standard has been described as a high burden that is "onerous, stringent, and rigorous." *In re Marriage of Diehl*, 221 Ill. App. 3d 410, 429 (1991); see, *e.g.*, *In re Marriage of Pleasant*, 256 Ill. App. 3d 742, 751 (1993) (finding that the standard is "an extraordinary" one and "is more stringent than the best interests standard"); *In re Marriage of Lombaer*, 200 Ill. App. 3d 712, 724 (1990) (evidence of mother's hospitalization for mental condition and failure to take psychiatric medication was insufficient to meet the onerous standard of serious endangerment to the children).

¶ 44    Although section 607(a) speaks to visitation, the Parentage Act does not expressly refer to section 607. Thus, to understand whether this presumption and the "serious endangerment" standard are "relevant" to a best-interests hearing on visitation under section 14(a)(1) of the Parentage Act, we consider the legislative purpose for the presumption as well as the high burden established to overcome it.

¶ 45    When the General Assembly enacted the Marriage Act in 1977, it substantially adopted the Uniform Marriage and Divorce Act (Uniform Marriage Act). See Unif. Marriage and Divorce Act § 101, 9A U.L.A. 171 (1998); Ill. Ann. Stat., ch. 40, ¶ 101, Historical & Practice Notes, at 6-7 (Smith-Hurd 1980) (referencing the Uniform Marriage Act). Section 607(a) of the Marriage Act is derived from section 407 of the Uniform Marriage Act. Ill. Ann. Stat., ch. 40, ¶ 607, Historical Note, at 70 (Smith-Hurd 1980). The comment to this section in the Uniform Marriage Act explains why the "serious endangerment" language was chosen:

> "Although the standard is necessarily somewhat vague, it was deliberately chosen to indicate its stringency when compared to the 'best interest' standard traditionally applied to this problem. The special standard was chosen to prevent the denial of visitation to the noncustodial parent on the basis of moral judgments about parental behavior which have no relevance to the parent's interest in or capacity to maintain a close and benign relationship to the child. The same onerous standard is applicable when the custodial parent tries to have the noncustodial parent's visitation privileges restricted or eliminated." Unif. Marriage and Divorce Act § 407, 9A U.L.A. 398-99, cmt. (1998).

Thus, the onerous standard derives from the general principle that in matters of visitation, as in custody, the primary concern is the welfare of the child. In a postdissolution setting, the legislature has presumed it to be in the child's best interests to maintain a continued, meaningful relationship with both parents after the dissolution. See also 750 ILCS 5/102(2) (West 2010) (stating that one of the underlying purposes of the Act is to safeguard family relationships); *In re Marriage of Seitzinger*, 333 Ill. App. 3d 103, 112 (2002) (noting that the best interests of the child is normally fostered by continuing a healthy and close relationship with the noncustodial parent); *Pleasant*, 256 Ill. App. 3d at 751 ("[t]here is a strong public

policy to preserve the relationship between a parent and child").

¶ 46 This general policy is also reflected in section 607(c) of the Marriage Act by limiting the court's power to restrict visitation rights in those circumstances. 750 ILCS 5/607(c) (West 2010); see also Ill. Ann. Stat., ch. 40, ¶ 607, Historical & Practice Notes, at 70 (Smith-Hurd 1980) ("The public policy of Illinois maintains that it is beneficial for a child to have a healthy and close relationship with both parents even after divorce [citations] and that visitation privileges should not be awarded or withheld as a punishment or reward to either parent.").

¶ 47 As a result, the presumptive right to visitation in section 607(a) of the Marriage Act, drafted over 30 years ago, is in keeping with the traditional model of a family paradigm, where each parent has presumably exercised custody over the child and one parent will now be granted custody and the other reasonable visitation. Such a presumption reflects a legislative recognition of the need to protect the preexisting parent-child bond that presumably developed prior to the divorce or separation of two parents. Thus, to overcome the presumption that visitation is in the best interests of the child in custody proceedings filed by a parent under the Marriage Act, the General Assembly sought a higher, more stringent burden on the custodial parent than merely the traditional best-interests factors.

¶ 48 In contrast, in actions under the Parentage Act, paternity is at issue and must first be proved. At the time visitation is sought, a relationship with the child may not have ever been forged, especially where paternity is established long after birth. See 750 ILCS 45/8(a)(1) (West 2010) (recognizing that the statute of limitations for raising paternity is two years after the minor reaches the age of majority). Additionally, the paradigm of preserving or continuing the parent-child relationship of a traditional intact family unit does not accurately reflect many family situations. See, *e.g.*, Siobhan Morrissey, *The New Neighbors: Domestic Relations Law Struggles to Catch Up With Changes in Family Life*, 88 ABA J. 37, 38 (March 2002) ("The domestic unit in early 21st century America [has become] a crazy quilt of one-parent households, blended families, singles, unmarried partnerships and same-sex unions."). Thus, in parentage actions, issues of visitation may arise under situations where the court may be asked to balance several competing interests related to the child.

¶ 49 As this case illustrates, there are many factors that may be relevant to whether visitation is in a child's best interests in the context of a paternity action. An alleged father seeking to determine his paternity and subsequent entitlement to visitation privileges may be confronted with an already existing meaningful relationship between a presumed father and a child, where the biological father has had no previous contact with the child. Alternatively, the alleged father may have been living with the child prior to a determination of paternity, or the marriage between the child's mother and a presumed father may have disintegrated so that there is not necessarily an "intact family." Additionally, there may be scenarios where a biological father may be the only person in the child's life who can effectuate the strong public policy of providing for the physical, mental, emotional, and monetary support of the child. 750 ILCS 45/1.1 (West 2010).

¶ 50 Given the myriad relationships that may evolve outside the parameters of a dissolution proceeding, the General Assembly could not have predetermined with such broad strokes that

the presumptive entitlement to reasonable visitation absent "serious endangerment" is in a child's best interests in every parentage action, without giving the court the flexibility to consider the facts and circumstances of each case. Rather, the plain language of section 14(a)(1), giving the court discretion in awarding visitation and requiring "a *finding* in the best interests of the child," contemplates a hearing where the court has the flexibility to consider whether, and to what extent, the biological father may now exercise visitation rights with respect to the child. (Emphasis added.) 750 ILCS 45/14(a)(1) (West 2010); *J.S.A.*, 224 Ill. 2d at 212. Accordingly, the "serious endangerment" standard under section 607(a) would undercut the court's statutory authority under section 14(a)(1) of the Parentage Act to deliberate and weigh factors relevant to making a "finding in the best interests of the child."

¶ 51    The provisions of section 602 of the Marriage Act are broader and allow the court to take into account the facts and circumstances of each case. Section 602(a) sets forth a nonexclusive list of best-interests factors that the trial court shall consider in making determinations related to custody. 750 ILCS 5/602(a) (West 2010). We have previously described visitation as a form of custody. *In re M.M.*, 156 Ill. 2d 53, 62 (1993). Those relevant factors include: (1) the wishes of the child's parent(s); (2) the wishes of the child; (3) the interaction and interrelationship of the child with the parent(s), siblings, and any other person who may significantly affect the child's best interests; (4) the child's adjustment to his or her home, school, and community; (5) the mental and physical health of the involved individuals; (6) the potential for violence or threat of violence; (7) the occurrence of ongoing or repeated abuse; (8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; (9) whether one of the parents is a sex offender; and (10) military obligations. 750 ILCS 5/602(a) (West 2010). These factors best promote the legislative intent under the Parentage Act given the nature of the proceedings.

¶ 52    We recognize, as Steve points out, that section 602(c) incorporates the policy of the Marriage Act that "the maximum involvement and cooperation of both parents regarding the physical, mental, moral, and emotional well-being of their child is in the best interest of the child." 750 ILCS 5/602(c) (West 2010). In that regard, we note that the trial court erred in stating that this presumption was not relevant to the best-interests hearing. Rather, the presumption is indeed relevant, but unlike the onerous "serious endangerment" standard in section 607(a), it may be overcome if, after considering the relevant factors, the court finds it is not in the child's best interests to grant visitation privileges.

¶ 53    Accordingly, for the foregoing reasons, it was error for the appellate court to apply the "serious endangerment" standard of section 607(a). We hold that in a proceeding to determine visitation privileges under section 14(a)(1) of the Parentage Act, the initial burden is on the petitioner to show that visitation will be in the best interests of the child pursuant to the provisions set forth in section 602 of the Marriage Act. To the extent that *Wenzelman*, *Jines* and *In re Parentage of Melton* contradict our conclusion, they are expressly overruled.

¶ 54                                              II

¶ 55    We next consider whether the trial court erred in determining that it was not in J.W.'s

best interests to have visitation with Steve at this time. A trial court's determination as to the best interests of the child will not be reversed on appeal unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. *In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988). A judgment is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *In re A.P.*, 2012 IL 113875, ¶ 17.

¶ 56    Dr. Frey, the court-appointed expert, and Dr. Osgood, Steve's retained expert, disputed J.W.'s cognitive understanding of her relationship to Steve and its implications for her best interests. They disagreed about the risks that introducing or reintroducing Steve into J.W.'s life would have on her emotional well-being and stability and the risk to her bond with Jason, whom she has known as her father for her entire life.

¶ 57    The testimony of Dr. Frey and the GAL supports the trial court's conclusion that visitation was not in the best interests of J.W. at this stage in her life. Based upon various testing procedures, and the evaluation and interviews with J.W., it was their opinion that, despite the fact that Steve and J.W. had spent some time together, at this stage in her cognitive development, J.W. did not understand Steve to be her father and was unable to process a relationship with him. Dr. Frey believed that disrupting her life by introducing Steve as her father at this stage, given her current chaotic life circumstances, would potentially increase her risk of instability, disrupt her emotional well-being, and could be detrimental to her long-standing relationship with Jason and her mother.

¶ 58    Dr. Osgood disagreed with Dr. Frey's premise and believed that Steve and his family had developed a close and meaningful bond with J.W. and believed that it would be detrimental to now disrupt that relationship. Dr. Osgood was critical of Dr. Frey's failure to observe Steve with J.W. Nevertheless, the trial court found that Dr. Osgood's opinions were not persuasive where she did not interview J.W. to understand her perception of her relationship with Steve, did not perform any independent testing, and instead relied solely on her review of Dr. Frey's report and an interview with Steve. Dr. Osgood did not refute any of Dr. Frey's testing methods.

¶ 59    The court considered that Steve was genuinely interested in having a relationship with J.W., and considered the experiences Steve had with J.W. in late 2008 and early 2009, which were supported by his sister's testimony and other evidence. Nevertheless, after weighing the relevant best-interests factors, the court ultimately found any presumption that it was in J.W.'s best interests to promote a parent-child relationship was rebutted by the evidence. In making its findings, the court relied upon the actions and behavior of J.W. as recounted by Dr. Frey and the GAL, and their concern for increased risk of harm to her at this stage in her concrete cognitive development. We cannot say that the trial court's ruling was clearly against the manifest weight of the evidence.

¶ 60    We note, and as Jason's counsel points out, the trial court's order and the statutory framework do not foreclose the possibility that in the future it may be in J.W.'s best interests to have a meaningful relationship with her biological father and to reintroduce him into her life. Steve has shown a committed interest in developing a relationship with J.W. and has adhered to his parental responsibilities of support. The no-contact order in no way reflects

a lack of desire on Steve's part to be a part of J.W.'s life. Nor should the no-contact order prohibit Steve in any future proceeding from having his own expert evaluate J.W. Rather, as reflected by the court's annual evaluation requirement, the denial of visitation was focused on J.W. and her circumstances at her stage of development at the time of the hearing. The parties and the court acknowledged that J.W. is a very resilient, strong, adaptable child, despite all of the chaos in her life. As she grows and develops, as Dr. Frey indicated, future evaluation of J.W. may suggest a different outcome.

¶ 61                                    CONCLUSION

¶ 62        For all of the foregoing reasons, we hold that the trial court correctly concluded that in a proceeding to entertain a petition for visitation privileges under section 14(a)(1) of the Parentage Act, the initial burden is on the petitioner to show that visitation will be in the best interests of the child pursuant to the provisions set forth in section 602 of the Marriage Act. Additionally, we conclude that the trial court's ruling, that it was not in J.W.'s best interests to award visitation privileges at this stage, was not against the manifest weight of the evidence. Accordingly, we reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 63        Appellate court judgment reversed.

¶ 64        Circuit court judgment affirmed.