NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220057-U

NO. 4-22-0057

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 2, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MATTHEW SMITH, | ) | Appeal from the |
|     Petitioner-Appellant, | ) | Circuit Court of |
|     v. | ) | Macoupin County |
| LACEY SMALL, | ) | No. 21F34 |
|     Respondent-Appellee. | ) | |
| | ) | Honorable |
| | ) | Kenneth R. Deihl, |
| | ) | Judge Presiding. |

---

JUSTICE HARRIS delivered the judgment of the court.
Justices DeArmond and Holder White concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's judgment allocating the majority of the parenting time to
respondent was not against the manifest weight of the evidence.

¶ 2   Petitioner, Matthew Smith, appeals from the trial court's order awarding
respondent, Lacey Small, a majority of the parenting time with respect to their minor son, T.D.S.
(born July 23, 2012). On appeal, petitioner argues the court's determination was against the
manifest weight of the evidence. We affirm.

¶ 3                              I. BACKGROUND

¶ 4   On January 19, 2021, petitioner filed a petition for allocation of parenting time.
Petitioner requested that the trial court award him the majority of the parenting time with respect
to T.D.S.

¶ 5                              A. The Best-Interest Hearing

¶ 6            On October 1, 2021, and November 29, 2021, the trial court conducted a hearing on the petition. We discuss the evidence relevant to the issue raised on appeal.

¶ 7                                    1. *Petitioner*

¶ 8            Petitioner testified he was in a relationship with respondent for approximately eight years. He lived with respondent and T.D.S. in Carlinville. The parties separated in 2018, when T.D.S. was five years old. T.D.S. has Down's syndrome, is nonverbal, and wears diapers. After the separation, petitioner moved into a two-bedroom apartment in Collinsville. According to petitioner, T.D.S. lived with petitioner during the summer and on the weekends during the school year. T.D.S. lived with respondent in Carlinville when T.D.S. was in school until August 2020.

¶ 9            Petitioner testified he works at America's Auto Auction in Centreville. He stated he begins work between 7 and 8 a.m. and leaves anywhere between 3 and 5 p.m. Petitioner testified that if he is still working when the school day ends, his mother or daughter watches T.D.S. until he returns from work. Petitioner's mother was 73 years old at the time of the hearing and his daughter was 18 years old. Petitioner testified T.D.S. also "sees my sister, her kids, their kids, brother-in-law, pretty much any of my immediate family that lives in the area around at least a couple times a month, if not more."

¶ 10           Around March 2020, respondent and T.D.S. "needed someplace to stay" so they moved in with petitioner. Petitioner testified that respondent moved out of her then-boyfriend's, Donald Burcham's, home because it was a "bad place." After about a week, respondent and T.D.S. moved back in with Burcham. According to petitioner, in April 2020, Burcham "kicked her out again and [T.D.S.] came to stay with me."

¶ 11        In August 2020, the parties agreed that T.D.S. should live with petitioner during the upcoming school year. Respondent helped petitioner enroll T.D.S. in the Collinsville school district. The parties further agreed they would discuss the possibility of T.D.S. returning to live with respondent when her living situation stabilized. Respondent typically saw T.D.S. once every other weekend during this time.

¶ 12        Sometime in late 2020, respondent moved back in with Burcham. One weekend in January 2021, prior to petitioner dropping T.D.S. off with respondent for the weekend, petitioner told respondent she needed to start providing her own supplies for T.D.S. Petitioner testified "that escalated into an argument that ended with her going to the police saying I took him." The parties met at the Collinsville police station with the understanding respondent would return T.D.S. the following Monday. However, respondent did not return him on that Monday. As a result, petitioner started custody proceedings, and the Circuit Court of Madison County entered a temporary order requiring respondent to return T.D.S. to petitioner. As part of the order, respondent received parenting time on the weekends.

¶ 13        Petitioner testified T.D.S. attended the Carlinville school district "from Pre K and through the end of the 2020 school year." Due to his disabilities, T.D.S. has always had an individualized education plan (IEP). Petitioner attended the IEP meetings when he lived in Carlinville. Petitioner testified that he also attends T.D.S.'s medical appointments. Petitioner testified respondent was unable to attend one of T.D.S.'s eye doctor appointments because she had to take Burcham to the hospital. On cross-examination, he acknowledged she had a "legitimate reason" for missing the appointment.

¶ 14        Petitioner agreed that respondent had raised concerns about T.D.S.'s weight gain. Petitioner testified he "immediately called his doctor and scheduled a blood workup to make sure

everything was okay." Petitioner claimed T.D.S. grew a "foot and a half" and "seem[ed] to be losing weight" ever since it was brought to his attention.

¶ 15 Petitioner testified T.D.S. receives $800 per month in social security payments due to his disability. Respondent had received the payments until about a month prior to the hearing. Petitioner testified he did not believe respondent was "financially, physically, or mentally capable of taking care of [T.D.S.] on a day-to-day basis."

¶ 16                    2. *Emma Reichert*

¶ 17 Emma Reichert testified she is employed as a behavioral specialist with a "special education cooperative that supports local rural school districts." Prior to that, she "worked as the early childhood special education teacher in [the] Carlinville School District." Reichert testified she was previously T.D.S.'s teacher and subsequently consulted on his case in her role as a behavioral specialist.

¶ 18 Reichert testified T.D.S.'s first IEP took place shortly before his third birthday. The service plan provided for "speech and language services, occupational therapy, *** developmental, cognitive, social, emotional skills." Reichert testified T.D.S. was happy in the Carlinville school district and had friends and "great relationships with staff." Reichert stated she had reviewed the "move-in IEP" created by the Collinsville school district. She testified the services provided by the two school districts were comparable.

¶ 19 Reichert stated that, in her opinion, respondent was more involved with the minor's education because she spoke with respondent regularly on the phone and saw her in-person at meetings. Reichert also testified that respondent "is a very good mother. She is a hard worker. She always puts [T.D.S.'s] needs above her own." Reichert further testified she did not believe T.D.S. would have any difficulty transferring back to Carlinville from Collinsville

because "he would be returning to the same teachers, the same assistants, the same therapists who have known him for eight years."

¶ 20                                  3. *Donald Burcham*

¶ 21        Donald Burcham testified he had been dating and living with respondent for approximately two years. T.D.S. lived with them during respondent's parenting time. Burcham stated he is much older than respondent. Burcham testified that, in March 2020, he and respondent agreed that given their age difference, she "needed a chance to reconcile" with petitioner so T.D.S. could have a better relationship with his father. Burcham testified respondent and T.D.S. only lived with petitioner for about a week before moving back in with him. Respondent and T.D.S. moved out again in August 2020 because Burcham's family still "wasn't accepting her because of the age difference." Burcham testified he never kicked respondent out of his house, stating instead that the two of them reached a mutual agreement. They remained in constant communication until respondent moved back in with him around November 2020. Burcham and respondent became engaged in February 2021.

¶ 22        Burcham testified T.D.S. is his "pride and joy" and described him as "my son." According to Burcham, T.D.S. "needs waited on 24/7 practically" and, in his opinion, petitioner is unable to meet T.D.S.'s needs because he frequently leaves the child with a babysitter who is not willing to provide the intensive care necessary. Burcham testified that when they meet petitioner for exchanges, T.D.S. "runs to his mother for hugs every time when his dad brings him to us. *** But he doesn't run up to his dad and hug him or anything like he does his mother." Burcham further testified that T.D.S. "hasn't been him[s]elf" since the temporary order was entered in January 2021, and he appears "run down" when petitioner drops him off. Burcham

further testified T.D.S. frequently has diaper rashes after he has spent several days with petitioner.

¶ 23                                             4. *Respondent*

¶ 24        Respondent testified that she lives in Carlinville with Burcham and T.D.S., when T.D.S. is with them. She has lived there since 2019, except for a brief period in March 2020 when she lived with petitioner and "in August when we agreed for me to leave due to conflict in the family."

¶ 25        Respondent testified she was previously in a relationship with petitioner from 2010 to 2018. She stated their relationship was initially good following T.D.S.'s birth but "started going downhill" after she had several surgeries. Respondent claimed petitioner was verbally abusive to her and did not want to care for T.D.S. even when she was recovering from her surgeries. According to respondent, when the parties separated in 2018, petitioner initially denied being T.D.S.'s father. However, after a few weeks he agreed to visit with the child. The parties agreed respondent would have T.D.S. during the week and petitioner would have him on the weekends.

¶ 26        Respondent testified T.D.S. was diagnosed with Down's syndrome when he was approximately three months old. She stated T.D.S. requires 24-hour care because "[t]here is nothing he can do without someone being there at least supervising, if not helping him." For example, T.D.S. frequently chokes on his food, needs his diaper changed often, and cannot bathe himself or wash his own hands.

¶ 27        Respondent testified that in March 2020, petitioner called her to ask if she and T.D.S. would move in with him "to try to make our family whole again." Respondent discussed this with Burcham, and they both agreed she should do it so T.D.S. could have a better

relationship with petitioner. However, respondent and T.D.S. moved out of petitioner's house within several days and moved back in with Burcham. Respondent described petitioner's apartment as "a dumpster."

¶ 28 Respondent again moved out of Burcham's house in August 2020 due to concerns about the age difference between the two—respondent is approximately the same age as Burcham's children. Respondent and petitioner agreed T.D.S. should live with petitioner and attend school in Collinsville until respondent "got back on [her] feet" because she did not have a house of her own at the time. In November, respondent moved back in with Burcham because they "really do love each other" and did not want to let "the conflict in the family" keep them from being together. However, respondent did not want T.D.S. to move back in with them until she resolved the conflict with Burcham's family. Respondent was able to resolve the conflict in December and asked petitioner to let T.D.S. live with her during the school year. According to respondent, petitioner refused to return T.D.S. to her and told her she "better have $10,000 if I wanted to see my child again." Respondent had to call the Collinsville police to have petitioner meet her at the police station to exchange T.D.S. Respondent re-enrolled T.D.S. in the Carlinville school district, and he remained living with her until the Circuit Court of Madison County entered a temporary order awarding petitioner the majority of the parenting time.

¶ 29 Respondent testified she has had three jobs since T.D.S.'s birth and has not had a paying job since approximately March 2020. Respondent stated she did not want to get a job so that she would be available to care for T.D.S. whenever possible. Respondent acknowledged that she depended on Burcham to pay her bills and for transportation. Nonetheless, she maintained her situation was stable because she was engaged to Burcham and he intended to give her the house when he dies.

¶ 30　　　　　Respondent testified that when the parties meet for exchanges, T.D.S. "always runs right up to me and hugs me real tight." Respondent further stated that "[w]hen it's time *** to get him ready to come back [to petitioner], he fights me getting him dressed, just pushing everything away." Once respondent "finally" is able to get T.D.S. ready, "he seems happy to see his dad." Respondent testified T.D.S. usually is not dressed appropriately for the weather when petitioner drops him off at exchanges. Additionally, respondent claimed T.D.S. has diaper rashes whenever petitioner returns him to her and he has gained nearly 30 pounds since he began living with petitioner following the Madison County court order. According to respondent, petitioner told T.D.S.'s doctor in January 2021 "that he could only get [T.D.S.] to eat popcorn, pork rinds, and milk, and that was it."

¶ 31　　　　　　　　　　　　　5. *Ian Murphy*

¶ 32　　　　　Ian Murphy was appointed to serve as the guardian *ad litem* (GAL) and prepared a report containing his recommendations. Murphy testified he did not need to make any changes to his report after hearing the testimony of the witnesses. In his report, Murphy recommended petitioner be awarded the majority of the parenting time. Murphy based his recommendation on "two factors." First, Murphy noted respondent did not have her own home in August 2020 and had to give T.D.S. to petitioner because she was unable to adequately care for him. Murphy further noted that, "because [respondent] doesn't have a job currently, she is relying on the relationship that she has to avoid her becoming homeless, which puts her in a slightly unstable position." Second, Murphy considered the fact that T.D.S. had been living with petitioner and attending the Collinsville school district for the past year and he did not "want to upend" his environment. However, in making his recommendation, Murphy also stated he had no reason to

believe either household or school district was better than the other and he would have recommended equal parenting time if the parties lived closer to one another.

¶ 33                                B. The Trial Court's Judgment

¶ 34        On December 27, 2021, the trial court entered a written order finding it was in T.D.S.'s best interests to award the majority of the parenting time to respondent. In its detailed order, the court made findings with respect to each of the best-interest factors enumerated in section 602.7 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/602.7(b)(1)-(17) (West 2020)).

¶ 35        This appeal followed.

¶ 36                                II. ANALYSIS

¶ 37        On appeal, petitioner argues the trial court erred in awarding the majority of the parenting time with T.D.S. to respondent. Petitioner asserts "the court failed to take into consideration multiple facts that weighed in [his] favor." Most importantly, according to petitioner, the court "failed to consider the obvious instability of [respondent]." Petitioner also points to the fact that the GAL recommended he be awarded the majority of the parenting time.

¶ 38        As an initial matter, we note respondent did not file an appellee's brief. However, because the record is straightforward and we can easily address petitioner's argument without the aid of an appellee's brief, we will decide the merits of this appeal. See, *e.g.*, *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976) ("[I]f the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief, the court of review should decide the merits of the appeal.").

¶ 39        Section 602.7 of the Marriage Act provides "[t]he court shall allocate parenting time according to the child's best interests." 750 ILCS 5/602.7(a) (West 2020). "In determining

the child's best interests for purposes of allocating parenting time, the court shall consider all relevant factors." *Id.* § 602.7(b). The relevant factors for the court to consider include, but are not limited to, the following:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities ***;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant."

*Id.* § 602.7(b)(1)-(17).

¶ 40      "[T]he best interests of the child is the 'guiding star' by which all matters affecting children must be decided." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 41. "A trial court's findings as to a child's best interest are entitled to great deference because the trial judge is in a better position than we are to observe the personalities and temperaments of the parties and assess the credibility of the witnesses." *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21. We will not reverse a trial court's best-interest determination "unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988). "A decision is against the manifest weight

of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61 (2009). Under a manifest-weight-of-the-evidence standard, a court of review "must not substitute its judgement for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *In re D.F.*, 201 Ill. 2d 476, 499 (2002).

¶ 41     Here, in its written order awarding respondent the majority of the parenting time, the trial court made express findings with respect to each of the factors enumerated in section 602.7 of the Marriage Act. See 750 ILCS 5/602.7(b)(1)-(17) (West 2020). The court found the factors listed in paragraphs (1), (7), and (13) were neutral, the factors listed in paragraphs (2)-(6), (8), and (12) favored respondent, and the factor in paragraph (9) favored petitioner. On appeal, petitioner challenges the court's findings with respect to the factors in paragraphs (2)-(6), (8), (12), and (17). We will address each of petitioner's contentions in turn.

¶ 42     The trial court found the factor in paragraph (2)—the wishes of the child— slightly favored respondent. *Id.* § 602.7(b)(2). The court relied on respondent's unrebutted testimony that T.D.S. "wishes to primarily reside with her because his conduct at exchanges indicates he does not want to go with [petitioner], and because the child gets excited at exchanges when it is [respondent's] time." Petitioner argues the court erroneously failed to consider that respondent also testified T.D.S. seems happy to see him at exchanges as well. Initially, we note the court stated that because T.D.S. is nonverbal and therefore unable to convey his wishes, it "afforded little weight" to this factor. Moreover, while it is true respondent testified T.D.S. "seems happy to see his dad," she also testified T.D.S. would struggle with her whenever she attempted to get him ready to meet petitioner. Respondent testified it was not until

she "finally" got T.D.S. ready and walked him all the way to petitioner's vehicle that he would let go of her hand and seemed happy to see petitioner. Based on the evidence, we cannot say it is clearly apparent the court should have found this factor favored petitioner.

¶ 43　　　The trial court determined the factor in paragraph (3)—the amount of time each parent spent performing caretaking functions in the two years preceding the filing of the petition for allocation of parenting time—favored respondent. *Id.* § 602.7(b)(3). The court found respondent provided the majority of care for T.D.S. until August 2020, when T.D.S. went to live with petitioner while respondent sought appropriate housing. Petitioner contends the court failed to consider the testimony that he "had the minor at a minimum of every weekend for at least two or three days each week." However, petitioner's statement—that he cared for T.D.S. "at least two or three days each week"—is itself an acknowledgment that respondent cared for the minor four or five days each week. Thus, we cannot say the court erred in finding that respondent cared for the minor the majority of the time leading up to the filing of the petition.

¶ 44　　　In finding the factor in paragraph (4)—any prior agreement or course of conduct between the parents relating to caretaking functions—favored respondent, the trial court noted respondent had performed the majority of the caretaking functions until August 2020, when "the parties agreed Father would care for the child until Mother was back on her feet." *Id.* § 602.7(b)(4). Petitioner asserts the court erred because "[t]he ultimate question is whether [respondent] moving back into the exact situation that caused the need for [T.D.S.] to reside with [petitioner] constitutes getting back on her feet. If not, then the parties' agreement that [T.D.S.] was to continue to live with [petitioner] should have been given more weight." It appears petitioner is asking this court to substitute its judgment for that of the trial court in determining whether respondent's situation had stabilized after she moved back in with Burcham. We decline

to do so. See *D.F.*, 201 Ill. 2d at 499 (stating a court of review "must not substitute its judgement for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn"). The trial court concluded respondent was "back on her feet," and petitioner fails to point to anything in the record demonstrating the opposite conclusion was clearly apparent.

¶ 45       The trial court concluded the factor in paragraph (5)—the child's interaction and interrelationship with his parents, siblings, and any other person who significantly affects the child's best interests—favored respondent. 750 ILCS 5/602.7(b)(5) (West 2020). The court found T.D.S. had a "close bond and positive relationship" with respondent and Burcham. The court also found, based on Reichert's testimony, that T.D.S. had a close bond with his friends, teachers, and other staff in the Carlinville school district. Petitioner argues the court "failed to give any weight to the relationship that [T.D.S] had with his father or his father's family." However, the court explicitly noted in its written order that "the child interacts with his paternal grandmother and paternal adult half-sister." Moreover, petitioner did not present any evidence that T.D.S. was uniquely attached to any of his family members. Instead, he merely testified T.D.S. occasionally spent time with his family members. Thus, it is not clearly apparent this factor favored petitioner.

¶ 46       Petitioner also challenges the trial court's finding with respect to the factor in paragraph (6)—the child's adjustment to his home, school, and community. *Id.* § 602.7(b)(6). Petitioner points to the testimony that T.D.S. was doing well in the Collinsville school district. However, he fails to acknowledge the testimony by Burcham that T.D.S. "ha[d]n't been hi[m]self" since living with petitioner for the majority of the time and appeared "run down" when he returned to respondent's house after spending the week with petitioner. Moreover,

Reichert testified the Collinsville school district was not providing any services that the minor would not receive in Carlinville. Reichert also testified that, in her opinion, it "would be an easy transition" for T.D.S. to transfer back to the Carlinville school district because "he would be returning to the same teachers, the same assistants, the same therapists who have known him for eight years." Thus, it is not clearly apparent this factor favored petitioner merely because T.D.S. had been doing well in the Collinsville school district.

¶ 47 The trial court found the factor in paragraph (8)—the child's needs—favored respondent. *Id.* § 602.7(b)(8). The court noted respondent had always been attentive to T.D.S.'s medical and dietary needs. It found respondent was unemployed and had plenty of time to attend to T.D.S. and that the Carlinville school district was better situated to meet T.D.S.'s development needs due to the "school's long history and familiarity with the child's education and abilities." Petitioner argues "there was ample evidence [he] was also able to meet [T.D.S.'s] needs" and "[t]he court should not have penalized [him] for working given the overwhelming evidence it has not affected his ability to care for or meet [T.D.S.'s] needs and there was no evidence that the Carlinville school district was in a better position to address [his] needs." Notwithstanding petitioner's assertion, we cannot say the trial court was incorrect in its assessment. Respondent testified T.D.S. had gained nearly 30 pounds in the short period of time he had been living mostly with petitioner. According to respondent, petitioner told T.D.S.'s doctor that "he could only get [T.D.S.] to eat popcorn, pork rinds, and milk." Moreover, respondent and Burcham both testified T.D.S. regularly had diaper rashes when he would return to their home after spending the week with petitioner. Thus, the court's finding was not arbitrary or unsubstantiated by the evidence.

¶ 48     The trial court found the factor in paragraph (12)—the willingness and ability of each parent to place the needs of the child ahead of his or her own needs—weighed in favor of respondent. *Id.* § 602.7(b)(12). The court noted respondent's "life has revolved around the child and his health, safety, and welfare." The court also noted she had to make a "difficult choice" in August 2020 to arrange for T.D.S. to live with petitioner "until she got back on her feet." Petitioner asserts that because respondent missed one of T.D.S.'s eye doctor appointments when she had to take Burcham to the hospital, there is "sufficient evidence" demonstrating respondent is unable to place the child's needs ahead of her own. Initially, we note petitioner acknowledged at the hearing that respondent "had a legitimate reason" to miss the eye doctor appointment. Moreover, missing a single appointment because of a medical emergency is not compelling evidence that a parent is unable to place her child's needs above her own. As noted by the court, the evidence presented demonstrates respondent had worked to meet T.D.S.'s needs since he was born.

¶ 49     Lastly, petitioner maintains "the most significant factor the court failed to take into consideration was the stability of the parties." *Id.* § 602.7(b)(17). Petitioner argues the court "failed to consider the obvious instability of [respondent] when making its decision." Petitioner contends respondent's current situation is no different than her situation was in August 2020, and he also points out the fact that the GAL recommended he receive the majority of the parenting time. First, we note the trial court "is not bound by the GAL's recommendation." *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 51. Moreover, petitioner is incorrect in stating the court failed to consider respondent's level of stability. In its written order, the court explicitly acknowledged the GAL "recommended [petitioner] receive the majority of parenting time based solely on the stability of the parties." Nonetheless, the court found "no testimony was presented

to suggest [respondent's] life with her fiancé moving forward would not be stable. In fact, the testimony presented was to the contrary, and the Court cannot follow the GAL's recommendation based on speculation alone." While petitioner's contention is supported by the GAL's recommendation, there is also sufficient evidence in the record to support the court's determination. Thus, we cannot say its judgment was erroneous.

¶ 50        Accordingly, for the reasons discussed, we find the trial court's best-interest determination awarding respondent the majority of the parenting time with T.D.S. was not against the manifest weight of the evidence.

¶ 51                                III. CONCLUSION

¶ 52        For the reasons stated, we affirm the trial court's judgment.

¶ 53        Affirmed.