**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 220248-U

Order filed November 14, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* A.A., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| a Minor | ) | Will County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal No. 3-22-0248 |
| Petitioner-Appellee, | ) | Circuit No. 18-JA-153 |
| | ) | |
| v. | ) | |
| | ) | |
| Mohammed A., | ) | Honorable |
| | ) | John J. Pavich, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HAUPTMAN delivered the judgment of the court.
Presiding Justice O'Brien and Justice McDade concurred in the judgement

**ORDER**

¶ 1     *Held*:   The circuit court's unfitness and best interest findings are not contrary to the manifest weight of the evidence. Respondent received due process of law during the parental rights termination proceedings.

¶ 2     Respondent, Mohammed A., appeals from the Will County circuit court's order

terminating his parental rights to A.A. Respondent argues: (1) the court's unfitness finding was

against the manifest weight of the evidence; (2) the court's finding that termination of

respondent's parental rights was in the best interest of A.A. was contrary to the manifest weight of the evidence; and (3) his due process rights were violated. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4        On September 5, 2018, the State filed its original petition for adjudication of wardship alleging A.A., born June 24, 2015, was neglected due to an environment injurious to her welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2018)). The petition listed A.A.'s mother as Ravay M., and father as Eduardo D. The petition alleged that there was "ongoing domestic violence in the home."[1] That same day, however, the State was granted leave to amend the petition on its face to name respondent as the father. The amended petition was identical to the first except that Eduardo's name was struck out and respondent's name was handwritten onto the petition. Also handwritten under the "Residence" heading was "Florida" and the following notations located at the bottom of the first page: "Not on BC" and "No VAP."[2]

¶ 5        The matter proceeded to a shelter care hearing. An order following the shelter care hearing established that the court found probable cause to believe that A.A. was neglected and her "parents have a history of domestic violence." The order directed the parties to cooperate with the Department of Children and Family Services (DCFS).

¶ 6        On September 14, 2018, the State filed an affidavit to support notice by publication and a notice of publication, which generally provided that upon diligent inquiry, respondent's whereabouts or place of residence was unknown, such that service in person or by mail was

---

[1]A report from Lutheran Child and Family Services indicated that there was a physical altercation between Ravay and Eduardo. While in a car with the children, Eduardo hit and kicked Ravay. Ravay then broke a beer bottle over Eduardo's head and stabbed him with the broken glass. Both parents required medical attention and were subsequently charged with domestic battery.
[2]The parties seem to agree that these indicate that respondent was not on the birth certificate and had not voluntarily acknowledged paternity.

impossible. Respondent was provided notice by publication. On that same date, the court's docket reflects that the matter was before the court on a "Re-Shelter Care Hearing" and, by stipulation of the parties, the court found probable cause for neglect and that the environment was injurious to A.A.'s welfare.

¶ 7        On September 18, 2018, a summons, with an attached affidavit identifying a specific address in Florida, was filed directing respondent to appear and answer the amended petition on November 14, 2018. On September 21, 2018, a certificate of publication was filed, which included copies of the published notice to respondent.

¶ 8        On November 14, 2018, the cause came before the court for status regarding service on respondent. Though no transcript of the hearing is included in the record on appeal, the court found respondent in default for failing to appear. The case was continued for an adjudicatory hearing on December 11, 2018.

¶ 9        On that date, the court conducted an adjudicatory hearing. Although respondent was not present, the court adjudicated A.A. neglected in that her environment was injurious to her welfare due to a history of domestic violence between Ravay and Eduardo. The order provided that respondent remained in default.

¶ 10        A dispositional report filed by Lutheran Child and Family Services (agency) on December 26, 2018, by caseworker Erica Hall provided that respondent was A.A.'s biological father. The report did not indicate what proof established respondent's paternity. During an October 11, 2018, telephone conversation, Hall informed respondent of his parental rights. Respondent stated that he was aware of the juvenile proceeding and "was allowing [Ravay] to handle the situation to get their [child] back in [Ravay's] care." Respondent asked how A.A. was doing and if she was "safe with her current placement." Hall told respondent that A.A. was doing

3

well. Respondent indicated that he "could not come to Illinois at this time." According to Hall, respondent declined to participate in an integrated assessment.

¶ 11   Hall attempted to reach respondent via telephone on three additional occasions in November and December 2018 and left him voicemails. The report noted that little was known about respondent's parenting capacity, mental health, or other relevant factors as respondent was not available to participate in the integrated assessment, was residing in Florida, and could not be contacted at the time of the assessment.

¶ 12   On January 9, 2019, respondent failed to appear at a dispositional hearing where A.A. became a ward of the court. The court stated that "[v]isitation by [respondent] is suspended until such time as he presents himself either to the Court or to the agency to engage in services." The court's written dispositional order further memorialized that respondent was not engaged in services and remained in default.

¶ 13   An April 10, 2019, permanency review report stated that respondent had contacted Hall on January 15, 2019, to inquire about A.A.'s wellbeing. At that time, respondent indicated that he was not interested in being assessed for services so long as Ravay was working toward A.A.'s return home. The report further provided that respondent was not currently participating in any services or visitation. While a permanency hearing was held on April 25, 2019, respondent was not present and the "Order Following Permanency Hearing" entered made no reference to respondent.

¶ 14   An October 7, 2019, permanency review report stated that respondent contacted the agency in June 2019, and expressed interest in working toward a goal of return home for A.A. However, the conversation was hindered due to a language barrier. The report indicated that Hall was attempting to obtain an interpreter for a second integrated assessment. Respondent said that

4

he planned on attending court on October 21, 2019, for the next scheduled permanency hearing. Hall recommended that a DNA test be ordered because respondent was requesting visitation but was not listed on A.A.'s birth certificate.

¶ 15    Respondent appeared in court for the first time on October 21, 2019, with his counsel who had just been appointed at that court appearance. The court entered an "Order Following Permanency Hearing" finding that respondent had not made reasonable efforts or progress and, *inter alia*, continued the cause for status "on father [respondent] services, IA, DNA" to November 22, 2019. The court also ordered that an Arabic interpreter be present for the next hearing.

¶ 16    On November 22, 2019, the court ordered the "report & service plan" to be filed on April 14, 2020. Throughout 2020, the cause was continued several times for, *inter alia*, status on respondent's services, an integrated assessment, and DNA testing. During this period, no integrated assessment or DNA testing was conducted and no services were recommended.

¶ 17    A June 25, 2020, permanency review report stated that the agency had yet to receive any record that respondent completed a DNA test and had been unable to reschedule respondent's integrated assessment due to issues with contacting respondent. The report related that between December 2019 and March 2020, five attempts were made to schedule an integrated assessment, and that the agency had not heard from respondent since March 2020. Respondent was present at a permanency review hearing that same day with counsel and an interpreter. Counsel explained that no DNA test was ordered because respondent was instructed "to do it through family court." Counsel further explained that it was difficult for respondent to coordinate the DNA test because A.A. did not currently reside in Will County and respondent resided in Florida. Respondent also alleged that he attempted to contact the agency on many occasions to no avail. The court

5

deferred any finding regarding respondent's progress as it appeared confusion existed as to respondent's contact with the agency.

¶ 18    On August 24, 2020, the State filed a motion to terminate respondent's parental rights, alleging respondent was the putative father. The motion alleged that respondent was unfit in that he failed to (1) maintain a reasonable degree of interest, concern, and responsibility as to A.A.'s welfare (750 ILCS 50/l(D)(b) (West 2020)); (2) make reasonable efforts to correct the conditions which were the basis for A.A.'s removal during the nine-month period from December 11, 2018, through September 11, 2019 (*id.* § 1(D)(m)(i)); and (3) make reasonable progress toward the return following adjudication during the nine-month period from December 11, 2018, through September 11, 2019 (*id.* § l(D)(m)(ii)). Multiple summonses were sent to respondent regarding the motion to terminate, however, the certified mail was returned. Thereafter, the State filed an "Affidavit to Support Notice by Publication" and on December 11, 2020, a certificate of publication was filed.

¶ 19    A December 16, 2020, permanency review report provided that when respondent appeared in court on June 25, 2020, he indicated he wanted to engage in services. Caseworker Erik Morgan informed respondent that he still needed to complete the integrated assessment. Morgan attempted to follow up with respondent after the hearing but never heard from him. Though no transcript is included in the record on appeal, the court entered an order that same day indicating that respondent was present at the permanency review hearing with counsel and an interpreter. The court found that respondent had not made reasonable efforts or progress.

¶ 20    After several continuances, on June 11, 2021, the matter proceeded to the fitness portion of the State's motion to terminate parental rights. Respondent was present with counsel and was assisted by an interpreter. The State called Morgan to testify. Morgan testified that during the

pendency of the case, there was periodic contact by telephone with respondent. Respondent did not complete an integrated assessment between December 11, 2018, and September 11, 2019. Despite the agency's instructions to do so, respondent never took the requisite steps to establish his paternity. Respondent had no contact with A.A. since the proceedings were initiated.

¶ 21     On cross-examination, Morgan testified that he became the assigned caseworker in October 2020, though the proceedings began in September 2018. As such, portions of Morgan's testimony stemmed from his recollection of the casefile. Morgan agreed that he had contact with both respondent and respondent's counsel about obtaining a DNA test. Morgan had no knowledge of any further effort on respondent's behalf to obtain a test and stated that he would have cooperated with obtaining A.A.'s DNA if counsel had petitioned for it. Respondent was unable to have visitation with A.A. because he had not established paternity. Morgan acknowledged that respondent's difficulties with completing certain tasks were partially due his out-of-state residency but noted "it's been over two years." Respondent obtained an integrated assessment on January 4, 2020. The assessment did not recommend any services until respondent established paternity, though Morgan recommended respondent have therapy with A.A. Morgan was unaware of any problems respondent had with alcohol or domestic violence.

¶ 22     On re-direct examination, Morgan testified that respondent had offered no proof of any attempt to establish his paternity during the period from December 11, 2018, through September 11, 2019. Morgan explained DCFS would not offer services to a purported father until paternity was established. Respondent sent a text message to Morgan in January or February 2021 and inquired about obtaining a DNA test. Morgan informed respondent that he needed to coordinate with his attorney to obtain a DNA test. At the conclusion of Morgan's testimony, the court took judicial notice of the April 25, 2019, October 21, 2019, June 25, 2020, and December 16, 2020,

7

permanency review orders and its assessments of respondent's progress on those dates. Following argument, the court took the matter under advisement.

¶ 23　　On June 17, 2021, the State filed a motion to reopen proofs, alleging several documents were admitted during Ravay's testimony at the June 11, 2021, fitness hearing that were never tendered to the State. Additionally, the State requested that the agency supervisor, Natalie Bauer, be allowed to testify. The court granted the State's motion over objection.

¶ 24　　A permanency review report filed on December 23, 2021, provided that while respondent had completed an integrated assessment, he had not completed any services or verified his paternity. On the same date, a DCFS family service plan was filed. The plan stated that respondent failed to obtain a DNA test despite being advised in 2019 that he needed to petition the family court for a test. The plan recommended that respondent engage in parent education and coaching specific to A.A.'s mental health needs but that such services could not commence until paternity was established.

¶ 25　　On December 27, 2021, respondent filed a petition seeking temporary parenting time. On January 27, 2022, respondent filed a petition to establish parentage and allocate parental responsibilities. The petition alleged, *inter alia*, that respondent was A.A.'s father pursuant to the attached voluntary acknowledgement of parentage.

¶ 26　　On February 9, 2022, the parties resumed the termination proceeding. Respondent's counsel informed the court that since termination of parental rights was at issue, the record should formally establish that respondent was A.A.'s father. Respondent was sworn in and testified that A.A. had been born during his relationship with Ravay, though the couple never married. Respondent admitted that he was A.A.'s biological father. The court accepted respondent's admission of paternity.

¶ 27 Bauer testified that she had been involved in the case since September 2018. Bauer indicated that the case originated based on "[a]llegation 60(b), which was risk of harm. There was a domestic violence incident between *** Ravay, and [Eduardo]." The domestic violence incident did not involve respondent. Respondent was asked to participate in an integrated assessment at the beginning of the case but failed to do so, stating that he would let Ravay handle the case. Respondent called the agency in January 2019 and wanted to know how Ravay was progressing. Respondent was told the agency could not disclose information about Ravay and was again offered an opportunity to participate in an integrated assessment and services. Respondent was not interested at that time and did not contact the agency again until July 2019, at which time he indicated a willingness to complete an integrated assessment. A caseworker began an assessment with respondent but respondent stated that he could not continue because he needed an interpreter. Thereafter, there was no communication with respondent until October 2019, when respondent appeared in court for the first time. At this time, the court informed respondent of his need to establish parentage.

¶ 28 Bauer testified that she had to reschedule an integrated assessment to be completed in December 2020. Thereafter, Bauer unsuccessfully tried to contact respondent to reschedule on several occasions. Respondent called in March 2020 and arranged to participate in an integrated assessment. However, when Bauer called respondent at the prearranged time, respondent did not answer. When respondent called back, he told Bauer that he was at work and could not complete the assessment. Bauer did not hear from respondent before the June 2020 court date.

¶ 29 On cross-examination, Bauer stated that there was no history of violence, criminal activity, or drug and alcohol usage in respondent's background, nor did respondent present A.A. with an environment injurious to her welfare. Bauer noted that respondent did not indicate that

9

he wished to establish paternity until one year and two months into the case. Bauer opined that respondent neglected A.A. by showing no interest in her case from September 2018 through July 2019, failing to call on birthdays and holidays, call the agency to check on her, or request to speak to A.A.'s foster parents. During the relevant nine-month period, respondent made "very minimal efforts" as far as facilitating A.A.'s return home. Bauer also noted that respondent did not admit that he was A.A.'s father until the termination hearing, nearly four years after A.A. was taken into shelter care.

¶ 30    Respondent's counsel called Ravay to testify. Ravay stated that A.A. lived with respondent in Florida from when she was born in 2015 until 2017. Ravay believed respondent was a good parent but provided that respondent never said he wanted to have anything to do with A.A. Respondent was able to tend to A.A.'s needs and sent monthly financial support payments. Ravay opined that respondent was a fit parent that maintained a reasonable degree of interest in A.A.'s wellbeing.

¶ 31    On cross-examination, Ravay clarified that she lived with respondent during the years that A.A. resided in Florida. Ravay agreed she had lost custody of A.A. in September 2018 and had no visits since 2019. Thus, anything she learned about A.A. since that time was through a third-party source.

¶ 32    Respondent testified that he resided in Florida and was employed as a butcher. Respondent believed his income was sufficient to support his household and testified that he provided A.A. with financial support. Respondent provided for all of A.A.'s needs during the first three years of her life. Respondent kept in daily contact with A.A when she moved with Ravay. Respondent bought toys for A.A. and tried to give her an iPad so that they could share photographs. However, the agency would not accept the gift. Respondent tried to see A.A., but

10

alleged the agency prevented him from doing so. Respondent testified that he never behaved in a manner that would have rendered him an unfit parent during the relevant time period. However, respondent, perhaps mistakenly, answered "[y]es" when asked whether he failed to maintain interest or contact with A.A. during the relevant time period. Respondent subsequently indicated that he maintained contact with A.A. when she and Ravay moved to Illinois. Respondent said that he contacted A.A. via video and called Ravay "[e]very day" after they moved.

¶ 33    Respondent parroted much of Bauer's testimony concerning the scheduling issues related to his integrated assessment, though respondent maintained that he called the agency several times per week but was unable to get through. Respondent left messages and voicemails that were not always returned. Respondent claimed he was present at every court date. Respondent wanted custody of A.A. and wished to provide for her financial and psychological needs. Respondent was willing and prepared to complete court-ordered services.

¶ 34    On cross-examination, respondent testified that he had not seen A.A. in person since 2017. Respondent never traveled to Illinois to visit A.A. A caseworker informed respondent of the instant proceedings at the inception of the case. Respondent claimed he reached out to A.A.'s foster family to check on A.A. Despite being aware that a series of court dates would ensue after September 2018, respondent did not attend court until June 2019. Respondent denied being informed by the court that he needed a DNA test, instead testifying that the court told him the opposite. Similarly, respondent stated that his attorney told him he needed a DNA test but subsequently told respondent he did not.

¶ 35    The State recalled Bauer, who testified that agency personnel was always available for a concerned parent regarding issues with their child's case. Bauer recalled that respondent wanted to give A.A. an iPad, but Bauer did not feel comfortable holding on to it to give to A.A. because

11

of how expensive it was. Bauer refuted respondent's claims of his frequent attempts to contact the agency.

¶ 36       Following the close of evidence and the arguments of the parties, the court took the matter under advisement. On March 23, 2022, the court found by clear and convincing evidence that respondent was unfit in that he failed to (1) maintain a reasonable degree of interest, concern, and responsibility as to A.A.'s welfare, and (2) make reasonable progress toward A.A.'s return during the relevant time period. The court reasoned that respondent failed to complete an integrated assessment, maintain consistent contact with the agency, complete any services, take steps to establish his paternity, and visit A.A. or call to check on her during the relevant time period.

¶ 37       On May 12, 2022, the court conducted the best interest portion of the termination proceeding. Child Appointed Special Advocates volunteer Sarabeth Butler testified that A.A. was six years old at the time of the hearing. A.A. and her sibling were placed with foster parents Luke and Alexa Bell. A.A. had been in the Bell's home since July 2019. The Bell's three biological children also resided in the home. Butler observed A.A. within the home monthly and described the home as loving and stable. A.A. had been diagnosed with attention deficit hyperactivity disorder (ADHD) and expressive language disorder. A.A. was in therapy and took medication for the disorders. The Bells expressed interest in adopting A.A. Butler recommended that A.A. be adopted by the Bells.

¶ 38       On cross-examination, Butler testified that she had visited A.A. approximately 24 times and had not observed disciplinary issues. Butler had never been contacted by respondent in any manner. Butler described the foster home as clean and A.A. as appropriately dressed. A.A. has her own, well-furnished bedroom, and appropriate toys, books, and other items.

12

¶ 39    Luke testified that A.A. had been with the family since July 2019. The Bells wished to adopt A.A. and her sibling.

¶ 40    On cross-examination, Luke testified that he was employed as a teacher and made a salary of approximately $56,000 per year in addition to Alexa's comparable salary. The Bells provide for A.A.'s physical needs, safety, and housing. Luke described A.A.'s special needs and that he is actively involved in attending to her educational needs. A.A. expressed to the Bells that she wanted to remain with the family permanently. Luke testified that A.A. has visits with her other siblings sporadically. A.A. participates in tumbling, dance, and soccer, and attends a local Christian church.

¶ 41    Morgan testified that he visited the Bell's home every month. Morgan described the home as loving and observed the children playing frequently. A.A. calls the Bells mom and dad. The Bells treat A.A. the same as their biological children. Morgan did not believe A.A. was old enough to opine on where she would like to be placed permanently.

¶ 42    Respondent's counsel called respondent to testify. Respondent lived in Florida, where his mother and sister also reside. Respondent said that his mother and sister are available to assist respondent if he had custody of A.A. Respondent recounted his employment as a butcher and described his residence as a two-bedroom apartment. Respondent had resided at the apartment for four years. Respondent earned $1000 per week and testified that he was able to support A.A. Respondent was a practicing Muslim and attended mosque weekly. Respondent stated that he used neither drugs nor alcohol and had no criminal record.

¶ 43    Respondent recounted that A.A. lived with him from 2015 to 2017. Respondent did not object to Ravay moving to Illinois with A.A. because he believed he would still see her. After A.A. left, respondent saw A.A. on FaceTime weekly and came to Illinois to visit A.A. three or

four times prior to the instant case. Respondent testified that he traveled to Illinois 14 times to participate in the instant proceedings. Respondent attempted to contact A.A.'s foster parents on one occasion but the agency would not allow contact. Respondent also had difficulty contacting the agency, stating that he called and tried to leave voicemails on more than 40 occasions.

¶ 44   Respondent wished for A.A. to reside with him and stated that he would take the requisite steps to retain custody of A.A. Respondent would provide A.A. with a loving, stable home, address A.A.'s special needs, ensure she received proper schooling, and foster A.A.'s religious upbringing. Respondent would not consent to A.A.'s adoption. At the conclusion of the hearing, the court took the matter under advisement.

¶ 45   On May 18, 2022, the court found by a preponderance of the evidence that it was in A.A.'s best interest to terminate respondent's parental rights. The court found that while respondent loved A.A., he had had minimal interaction with her over the last several years. In contrast, the court found that a strong bond had developed between A.A. and her foster family and that A.A. deserved the permanency of a loving and supporting family. The court appointed DCFS as guardian and custodian of A.A. with the authority to consent to A.A.'s adoption. Respondent appeals.

¶ 46                                         II. ANALYSIS

¶ 47                                          A. Fitness

¶ 48   Respondent argues that the circuit court's unfitness finding was against the manifest weight of the evidence. Respondent contends that the court did not enter an order adjudicating A.A. neglected by respondent prior to the December 11, 2018, to September 11, 2019, time frame cited in the State's termination petition. Respondent further argues that Bauer testified that he was never indicated for "[a]llegation 60(b), which was risk of harm. There was a domestic

14

violence incident between *** Ravay, and [Eduardo]." Additionally, respondent maintained a reasonable degree of interest as to A.A., but his efforts were hindered by the agencies supervising A.A.

¶ 49    Parental rights termination proceedings are initiated by the filing of a termination petition pursuant to the provisions of the Act. 705 ILCS 405/2-13 (West 2020). Thereafter, a parent's rights may be terminated upon clear and convincing evidence that the parent is unfit under any of the grounds enumerated in section 1(D) of the Adoption Act. *In re D.D.*, 196 Ill. 2d 405, 417 (2001); 750 ILCS 50/1(D) (West 2020). To warrant an unfitness finding, the State must show that the parent is unfit during any nine-month time period after an adjudication of abuse or neglect. 750 ILCS 50/1(D)(m) (West 2020). A court need only find one of the grounds alleged in the State's petition to find a parent unfit. *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). A court's fitness determination will not be reversed on appeal unless the ruling is against the manifest weight of the evidence. *Id.* A ruling is against the manifest weight of the evidence where the opposite conclusion is clearly evident. *Id.*

¶ 50    In this case, the State alleged that respondent was unfit due to the following three grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to A.A.'s welfare; (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal of A.A. during the period of December 11, 2018, to September 11, 2019; and (3) failure to make reasonable progress toward the return of A.A. within nine months after an adjudication of neglected or abused minor, that period being December 11, 2018, to September 11, 2019. See 750 ILCS 50/1(D)(b), (D)(m)(i), (D)(m(ii) (West 2020)).

¶ 51    From our review, the evidence at the unfitness hearing clearly and convincingly established that respondent failed to maintain a reasonable degree of interest, concern, or

15

responsibility. Respondent testified that he had not had contact with A.A. since September 2018 and had not travelled to Illinois to visit A.A. since 2017. For nearly the first three years of this case, respondent did not complete the integrated assessment, a necessary step to obtain his service plan and make reasonable progress. Respondent also took no steps to establish paternity before the 2022 termination hearing began. Instead, respondent originally showed disinterest in the proceedings as he initially indicated to the agency that he did not want to participate because he was allowing Ravay to handle the case. It was not until the October 21, 2019, hearing, more than one year after the wardship petition was filed, that respondent attended a court hearing. Notably, respondent did not attempt to establish paternity early on in the case to enable him to obtain a service plan and possible visitation with A.A. As indicated by Bauer's testimony and numerous reports, respondent only inquired as to how A.A. was doing in her foster placement twice—October 2018 and January 2019. Respondent did not attempt to contact A.A. or request to speak with the Bells.

¶ 52 During the termination hearing, respondent testified that he had provided financial support for A.A. after she and Ravay moved to Illinois from Florida. However, the record is unclear as to the amount of financial support respondent provided. Additionally, there is no indication that respondent continued to send financial support after the State filed the wardship petition in September 2018. Instead, the only evidence that respondent provided financial support or gifts for A.A. after the beginning of this case was his attempt to give to the agency an iPad to enable him to communicate with A.A. Ultimately, the agency refused to accept this gift, and respondent made no additional attempts to provide gifts through the agency for A.A. or other financial support. Standing alone, respondent's single attempt to give A.A. an iPad is insufficient to establish a reasonable degree of interest or concern.

¶ 53        We note that between September 2018 and October 2019, the record establishes that

respondent's address and unfamiliarity with the English language were relatively unknown

barriers to his participation in the proceedings. These issues very likely created impediments to

respondent's ability to exhibit concern and make progress. After all, the agency did not seek the

use of an Arabic language interpreter until after its June 2019 telephone call with respondent was

ended due to the language barrier. However, these impediments do not completely excuse

respondent's general indifference. Importantly, during this period, respondent was able to ask

how A.A. was doing in October 2018 and January 2019. This was the extent of respondent's

expressed concern about A.A. As noted above, respondent did not further inquire about A.A.,

seek to speak with A.A., or attempt to speak with A.A.'s foster family. Therefore, even after the

use of an interpreter, respondent demonstrated minimal concern for A.A.

¶ 54        Given respondent's initial indifference, delay in establishing paternity and completing the

integrated assessment, and lack of expressed concern about A.A., the court's unfitness finding on

this ground was not contrary to the manifest weight of the evidence. Having found that the

evidence clearly and convincingly established that respondent failed to maintain a reasonable

degree of interest, we need not determine whether respondent made reasonable efforts or

progress.

¶ 55                                B. Best Interest

¶ 56        Respondent argues the circuit court's best interest finding was contrary to the manifest

weight of the evidence. Respondent points to several of the best interest factors that disfavored

terminating his parental rights, including: (1) respondent wanted custody of A.A.; (2) he cared

for A.A. for the first two to three years of her life; (3) he has a home for A.A.; (4) he is employed

and makes enough money to support himself and A.A.; (5) his sister and mother live near him

17

and would be willing to help care for A.A.; (6) he is religious and attends mosque regularly; (7) he is committed to making sure A.A. receives assistance and/or treatment for her ADHD and language issues; and (8) he is A.A.'s biological father. Respondent also points out that the court failed to consider the instability of the foster care system and that A.A. has been transferred between several homes during the pendency of this case.

¶ 57        Following a finding of parental unfitness, the court's focus must shift to the child's interest in "a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). At this stage, the State's burden of proof lessens to a preponderance of the evidence. *Id.* at 366-67. When considering whether the termination of parental rights serves the child's best interest, courts consider: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachment; (e) the child's wishes and long-term goals; (f) the child's community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020); *In re A.F.*, 2012 IL App (2d) 111079, ¶ 45. A circuit court's finding that the termination of parental rights is in the child's best interest will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55.

¶ 58        Here, the evidence from the best interest hearing favored terminating respondent's parental rights. Specifically, A.A.'s foster parents, the Bells, had provided for A.A.'s safety and welfare. A.A. had her own bedroom and was well provided for in the Bell's home. A.A. had also started to identify as a member of the Bell's family. By all accounts, A.A. was happy and well-

18

adjusted to her foster family. She referred to the Bells as mom and dad and her foster siblings as brother and sister. According to the caseworkers and Luke, A.A. had a strong bond with her foster family, and the Bells expressed a desire to adopt A.A. and her sibling. A.A. had been with the Bells since July 2019, nearly three years at the time of the termination hearing. A.A. had also developed ties to the community through her school, church, and extracurricular activities. At school, A.A. had an education plan designed to address her ADHD and learning disorder. Finally, the permanence factor weighs heavily in favor of terminating respondent's parental rights. A.A. spent more than half of her life in foster placements during the pendency of the case. For nearly three years she has been a part of the Bell family and they have expressed a willingness to permanently make her a part of their family. In contrast, respondent has not had a major role in A.A.'s life since she left Florida in 2017. Even before the case began, respondent visited A.A. in Illinois only a couple of times. After the instant case began, respondent only became somewhat involved after the proceedings had been ongoing for a year. Respondent's on-record participation in this case and testimony did not establish a strong interest in reestablishing strong familial ties with A.A. As noted above, respondent rarely asked how A.A. was doing and waited until very late in the case to seek visitation. *Supra* ¶ 51.

¶ 59    The only factor weighing against termination were the cultural differences between respondent, a devout Muslim, and the Bells, who were taking A.A. to their Christian church. However, there was no indication in the record that A.A. was being raised as a Muslim before the case began. Therefore, the court's best interest finding and termination of respondent's parental rights were not contrary to the manifest weight of the evidence.

¶ 60                                 C. Due Process

¶ 61    Respondent raises a general argument that he was denied due process of law.

¶ 62    Parents have a fundamental liberty interest in maintaining a parental relationship with their children. *In re Vanessa C.*, 316 Ill. App. 3d 475, 481 (2000); *In re J.J.*, 201 Ill. 2d 236, 267 (2002). However, in limited circumstances, the State may interfere with a parent's fundamental right when it becomes necessary to protect the health, safety, and welfare of the children. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Ultimately, due process is achieved in this context through compliance with the Act and fundamental fairness. *Id.* "In juvenile proceedings, due process requires adequate notice of the proceedings to a minor and his parents." *In re E.S.*, 324 Ill. App. 3d 661, 669 (2001). If a pleading fails to name and notify the necessary respondent, it fails to invoke the jurisdiction of the court and renders its subsequent orders void. *Id.* Appellate courts review potential due process violations *de novo*. *In re J.M.*, 2020 IL App (2d) 190806, ¶ 37.

¶ 63    To the extent that respondent contends that the court violated his right to due process when it found him in default for not appearing at the initial dispositional hearing on January 8, 2019, we find that we do not have jurisdiction to consider this issue. Because a dispositional order is a final order (see *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000)), respondent had 30 days from the January 8, 2019, order to file a notice of appeal. As respondent did not file a notice of appeal during this 30-day period, this court does not have jurisdiction to consider the circuit court's prior order. See *In re Ay. D.*, 2020 IL App (3d) 200056, ¶ 38.

¶ 64    We further find that the court did not infringe on respondent's right to procedural due process. Procedural due process requires that respondent: (1) receive notice of the proceedings; and (2) have an opportunity to be heard. *In re D.M.*, 2020 IL App (1st) 200103, ¶ 39 (citing *In re D.P.*, 319 Ill. App. 3d 554, 558 (2001)). The record conclusively establishes that respondent received notice of the proceedings as he was informed by the caseworker and was served with summons. Approximately one year into the case, respondent appeared for a hearing. In total,

respondent appeared for 14 proceedings, including the termination hearings. Thus, respondent received notice and was provide multiple opportunities to be heard during the proceedings.

¶ 65                                    III. CONCLUSION

¶ 66        The judgment of the circuit court of Will County is affirmed.

¶ 67        Affirmed.