NOTICE

Decision filed 10/14/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250409-U

NO. 5-25-0409

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| TIFFANY A., | ) | Madison County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 22-DC-257 |
| | ) | |
| DAVID A., | ) | Honorable |
| | ) | Maureen D. Schuette, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's judgment awarding a majority of parenting time to David A. is affirmed where the guardian *ad litem*'s report was adequate and thorough, and the circuit court's analysis and subsequent findings were not against the manifest weight of the evidence.

¶ 2   Following a two-day hearing, the circuit court allocated a majority of the parenting time of the parties' two minor children to the father, David A. (David). The mother, Tiffany A. (Tiffany) appeals, contending that the guardian *ad litem*'s investigation was inadequate, which resulted in the circuit court's reliance on an insufficient report. She further argues that the circuit court's evaluation of the statutory best interest factors should have resulted in an order awarding her a majority of the parenting time. The circuit court also found that it was in the best interests of the

1

children for Tiffany and David to share joint decision-making authority for the four significant issues: education, health, religion, and extracurricular activities. Tiffany did not appeal this ruling. For the following reasons, we disagree with Tiffany's claims of error and affirm the circuit court's parenting time ruling.

¶ 3                                    I. BACKGROUND

¶ 4      Tiffany and David were married on February 7, 2014. Two children were born during the marriage, L.R.A., born on February 18, 2015, and J.D.A., born on November 16, 2017. Before Tiffany filed for dissolution of her marriage, the parties and their children lived in Louisiana. Tiffany and the children traveled to Edwardsville, Illinois in June 2022 to visit with her family. Tiffany opted to remain in Illinois; filed her petition for dissolution of her marriage to David on August 1, 2022; and enrolled the children in Edwardsville schools.

¶ 5                                    A. Pretrial Pleadings

¶ 6      In Tiffany's petition for dissolution, she requested sole decision-making authority regarding the children's education, health, religion, and extracurricular activities. She also requested primary parenting time. She filed a petition for temporary relief seeking sole decision-making authority and parenting time.

¶ 7      David was served with the dissolution petition on December 8, 2022. On December 28, 2022, the circuit court entered a temporary order which granted David holiday parenting time and further ordered him not to remove the children from Illinois. Tiffany was awarded all other parenting time.

¶ 8      On February 9, 2023, the circuit court ordered mediation for creation of a parenting plan. On July 12, 2023, Kelly Stephen (Stephen) was appointed as the guardian *ad litem* (GAL). The circuit court ordered mediation and GAL costs to be shared evenly between Tiffany and David.

2

¶ 9    On December 19, 2023, an agreed order was entered granting David parenting time every other weekend and designated the parties' parenting time for the 2023 Christmas break.

¶ 10    On March 12, 2024, the GAL filed her report. She interviewed the parents and the children, and she also spoke to one of David's friends and David's ex-girlfriend. After analyzing the best interest factors contained in sections 602.5 and 602.7 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/602.5, 602.7 (West 2022)), the GAL recommended that David have a majority of the parenting time during the school year, and if Tiffany moved to the Quincy area, the parties should alternate parenting time each week. If Tiffany remained in Edwardsville, the GAL recommended that she be granted parenting time on the first, second, and fourth weekends of every month. She also recommended that the parties share joint decision-making responsibilities.

¶ 11    On July 8, 2024, David filed a position statement, requesting joint decision-making authority for education, health, religion, and extracurricular activities. He believed that it was in the best interests of the children for the parties to reside within 50 miles of each other and alternate parenting time on a weekly basis.

¶ 12    On July 9, 2024, Tiffany filed her position statement, contending that she had historically been the primary parent and that David was not stable. Tiffany did not specify her wishes regarding parenting time or allocation of parental decision-making authority.

¶ 13                                                      B. Hearing

¶ 14    The matter proceeded to a hearing on two days in July 2024. The following is a summary of the relevant testimony.

3

¶ 15                                              1. *David A.*

¶ 16    The parties lived in Bossier City, Louisiana for three and a half years, and during that time Tiffany frequently traveled to Edwardsville to visit her family. In May 2022 Tiffany and the children traveled to Edwardsville, Illinois for a vacation, but she and the children never returned to Louisiana. Eventually David also moved to Illinois, and currently lives in Mendon, Illinois in a rental house. Prior to residing in Mendon, he lived with his sister in Quincy but left following an incident in which his nephew was accused of potentially engaging in sexual misconduct with his boys.

¶ 17    David testified that in February 2022 he learned that Tiffany had an account on a dating site. Before this discovery, he was unaware of any issues with their relationship. During February and March 2022, there were instances when Tiffany would leave him and the children at home, and at no point did she express any concerns regarding leaving the children in his care. Tiffany engaged in excessive drinking during these months. David acknowledged that he was also drinking excessively during this period.

¶ 18    In May 2022 Tiffany complained about David's controlling behavior, including her inability to have any time by herself. On one occasion, she retreated to her room and closed the door. David then used a screwdriver to unlock the door and gain entry. On another occasion, David made 31 consecutive phone calls to her and often yelled at her during calls. The parties attempted marriage counseling.

¶ 19    David served in the United States Armed Forces and was deployed for 12 to 13 nonconsecutive months. When he was deployed, Tiffany served as the primary caretaker, ensuring that the children were adequately fed, clothed, and taken to medical appointments. David's last deployment concluded on November 17, 2018, at which time L.R.A. was four years old and J.D.A.

4

was two. David's final military assignment was as a recruiter in Bossier City, Louisiana, a full-time role. In addition to his duties as a recruiter, he engaged in real estate transactions for supplemental income, dedicating approximately five to six hours weekly to this endeavor. He retired from military service on January 12, 2023.

¶ 20　David suffered from post-traumatic stress disorder (PTSD), and upon his return from deployment, his symptoms became more apparent, including anxiety, aversion to loud noises, discomfort in crowded environments, and occasional nightmares. He did not exhibit anger, did not damage property, and was not mean. He was prescribed Propranolol for anxiety and PTSD, which had a calming effect, and he had always taken his medication as prescribed. He received disability benefits from the military based in part on his PTSD diagnosis, and he was engaged in therapy. However, he was seeking a new therapist because he found that the current treatment approach was ineffective.

¶ 21　David testified that he would occasionally consume excessive amounts of alcohol at Louisiana social gatherings. He received a driving while intoxicated (DWI) charge in Louisiana, had one month remaining on his probation, and faced no restrictions on his driving privileges. David stated that he had limited his alcohol intake since he moved to Illinois.

¶ 22　In July 2022 Tiffany permitted David to take the children from Edwardsville to Quincy to visit his family. No court order was in effect at that time, and Tiffany expressed no concern with David taking the boys. Two and a half weeks later, Tiffany appeared unannounced to get the children. As David's home in the summer of 2022 was still in Louisiana, he planned to return to Louisiana with the children to prepare them for the upcoming school year, and consequently, did not let Tiffany take them back to Edwardsville. The following day, Tiffany obtained an order of protection, and law enforcement officers removed the boys from his care. Following the

5

termination of the order of protection, David was allowed to have parenting time with the children and was authorized to pick up the children from Tiffany's residence for his parenting time.

¶ 23    In the fall of 2022, David discovered that the children were enrolled in an Edwardsville school. He and Tiffany did not have an agreement to enroll the boys in the Edwardsville school district, and he had not consented to the children remaining in Illinois.

¶ 24    In September 2023 an allegation was made that David's nephew in Quincy sexually touched the two boys. The Department of Children and Family Services (DCFS) opened an investigation. David had no contact with his children after the DCFS case was filed until the children were interviewed by the Children's Advocacy Center. Tiffany started the boys in therapy but would not disclose the counselor's identity to David.

¶ 25    During the 2023-2024 academic year, Tiffany informed David about an incident on the school bus where L.R.A. attempted to force J.D.A.'s mouth on his penis. Additionally, there were reports that the children engaged in fights and other "behaviors" at school. David testified that during the past year, the boys engaged in a "weird humping thing," which he tried to stop.

¶ 26    David testified that the Edwardsville school sent him two truancy letters and a notice indicating that L.R.A. had 27 absences, including 11 unexcused. David reviewed the days L.R.A. missed school and determined that none of the missed Mondays occurred after his designated parenting weekends, contrary to Tiffany's assertions. The boys only engaged in extracurricular sports for 3 of the 24 months they lived in Edwardsville.

¶ 27    David testified that he enjoys hunting, fishing, riding four-wheelers, reading books, recreational activities at home, and camping with his children. Mendon was recognized as a good school district and "a real community." The boys enjoyed residing in the countryside. David testified that he had the support of family and friends in Mendon. Additionally, traveling soccer

programs were available in the area. When the parties lived in Louisiana, the children participated in soccer, and David served as their coach. When he was not deployed, David transported the children to school, attended church services with them, prepared dinner, put them to bed, read to them, and performed all other required parental duties.

¶ 28    David testified that the current temporary parenting time order permits him to have parenting time every other weekend. He stated that when the boys arrive at his home, they are unruly and use inappropriate language; however, they generally become more composed by the day they are scheduled to return to Tiffany. When it is time for them to leave, the boys often throw themselves on the ground, crying that they do not want to leave. He acknowledged making the statement that Tiffany had "stolen the boys" from him in front of the children.

¶ 29    David testified that the children would attend Unity Elementary, which is 10 to 12 minutes from his Mendon home if parenting time was awarded to him. The boys had friends within the Mendon neighborhood. They would be able to play baseball, football, and track. Additionally, the travel soccer team was another activity available for the boys. Although David had considered moving to Edwardsville, he testified that he would earn less income if he moved.

¶ 30                                    2. *Michael Hurlbut*

¶ 31    Michael Hurlbut (Hurlbut) is Tiffany's boyfriend, and he has been acquainted with Tiffany and the boys since November 2022. He testified that he engaged in various activities with them, including taking them on short vacations, riding four-wheelers, fishing, swimming, and occasionally retrieving them from school. On weekends, the boys and Tiffany stay at his house. Each boy has his own bedroom in Hurlbut's house.

¶ 32    Hurlbut testified that Tiffany was good at disciplining the boys and teaching them right from wrong. He stated that after the boys have parenting time with David, upon their return, they

7

behave badly towards Tiffany and act out due to their frustration at not being with their father. However, by the following morning, the children always returned to normal.

¶ 33    Hurlbut said that Tiffany prepared the boys for their parenting time with David. He had never heard Tiffany make any negative remarks about David. However, he said that the boys had said that Tiffany was trying to steal them from David.

¶ 34    Hurlbut testified that he knew that Tiffany eliminated communication between the boys and David due to comments David allegedly made to L.R.A. about Tiffany. He knew that there had been prolonged periods during which David had not seen the boys. He admitted that he sent text messages and photos of gifts to the boys when they were in David's care.

¶ 35                                      3. *Deanna Geist*

¶ 36    Deanna Geist (Geist), David's former girlfriend, testified that their relationship lasted from November 2022 until August 2023 when she discovered his infidelity. She said that David was intoxicated approximately 95% of the time during their relationship and doubted his testimony that his alcohol consumption had decreased. Geist said that although David was frequently intoxicated, she had no concerns about his presence around her children.

¶ 37                                      4. *Tiffany A.*

¶ 38    Tiffany lived in Edwardsville with her parents and children. Her parents split their time between Illinois and Florida. Tiffany testified that she spends three to four nights each week with her boyfriend.

¶ 39    Tiffany testified that she came to Edwardsville in May 2022 to get away from David, stating that she felt suffocated. Her original plan was to stay in Illinois for two weeks. She testified that David was controlling and consumed excessive amounts of alcohol.

8

¶ 40   Tiffany acknowledged her own excessive alcohol consumption but said that the time she "passed out" was due to prescription blood thinners, not alcohol. However, she admitted to specific instances where she consumed too much alcohol while she was with the boys and responsible for their care. She testified that she no longer drinks excessively.

¶ 41   Tiffany recounted an incident in October 2023 when she and Hurlbut picked up the children after a visit. David believed that she was high and that Hurlbut was intoxicated. They left with the boys and were soon pulled over by the police. She was told that David had called the police. Another incident occurred when she sought to collect the boys before David's parenting time was over and David declined. Likewise, on Mother's Day, she inquired if she could take the boys early, and he said no, citing that it was his designated parenting time.

¶ 42   Tiffany testified about a text message she sent David to tell him she would drop the boys off with him at 2 p.m. David told her that he was working until 5 p.m. Tiffany then said: "Then don't have your weekend. Don't know what to tell you." At Thanksgiving of 2023, she would not allow the boys to speak with David because she was upset that he had called the police following the exchange incident. Tiffany testified about what she told the boys when she prevented David from having parenting time:

> "I tell them that they're just going to stay with me this weekend, and I will let them know when we're going to daddy's next. They usually don't ask too many questions. I think [L.R.A.] had honestly known from the police pull over, he knew I was pretty upset about that, so he didn't question me on why he couldn't go to dad's that next weekend or that following weekend."

¶ 43   Following the DCFS report involving the boys' cousin, Tiffany prohibited the boys from communicating with David for approximately one month. She also restricted their use of the

9

telephone to contact him. She recognized that this suspension of contact was painful for the boys and David.

¶ 44　The boys were doing well in school and were beginning their third year in the Edwardsville school district. The children had established friendships within the neighborhood. She acknowledged that the children were absent from school 27 times and that she received two truancy letters for the 2023-2024 academic year but stated that she had failed to submit several notes from the boys' doctors' appointments. Additionally, J.D.A. had experienced dental emergencies, undergone a DCFS interview, received therapy, and had sick days.

¶ 45　Tiffany testified that the boys loved soccer, and J.D.A. particularly enjoyed hockey. She decided not to enroll them in soccer during the divorce proceedings because she lacked assistance to get them to and from practices and was concerned that enrolling them in sports before the divorce was final would impose unreasonable responsibilities on her. Furthermore, she doubted that David would cooperate with her concerning their sports activities.

¶ 46　When she discovered that David's nephew allegedly engaged in inappropriate conduct toward her children, she promptly reported the allegation to DCFS. The children were interviewed. She remained concerned about the possibility of the children being left unsupervised in the presence of their cousin.

¶ 47　When the boys returned from parenting time with David, they were generally sad and avoided eye contact with her. She was concerned that if the boys were entrusted to David's care during the academic year, they might become alienated from her.

¶ 48　She acknowledged that it was not in the best interests of the children to be deprived of regular contact with a parent for extended periods. She recognized difficulties in sharing information with David, notably failing to inform him of the identity of the boys' therapist or that

10

she had enrolled them in an Edwardsville school without his consent. Despite his requests for copies of their birth certificates, she refused to provide them. Additionally, there have been instances where she had blocked David's access to L.R.A.'s phone.

¶ 49                          5. *Taylor Hoedebecke*

¶ 50    Taylor Hoedebecke (Hoedebecke), Tiffany's twin sister, lived in Edwardsville and spoke with Tiffany approximately once a week. She watches the boys approximately twice a month, either at her home or at their parents' home. Hoedebecke testified that the boys had a very affectionate relationship with Tiffany, who was attentive to their needs and exhibited a nurturing disposition.

¶ 51    In February 2022 Hoedebecke visited the parties in Louisiana. She characterized the interaction between Tiffany and David as negative and argumentative. David exhibited aggressiveness and controlling tendencies, and she observed him consuming alcohol heavily. During his intoxicated evenings, she and Tiffany assumed responsibility for caring for the children. She said that Tiffany had always been the primary caregiver for the boys.

¶ 52                          6. *Erin Townzen*

¶ 53    Erin Townzen (Townzen) served as the practice director at Brickman Orthodontics. She oversaw the staff, which included Tiffany. Tiffany was a dental assistant, working from 7:30 a.m. to 5 p.m., four days a week, with the practice closed on Fridays. Tiffany demonstrated exceptional rapport with patients and was a dependable employee. Townzen had observed Tiffany's interactions with her children and noted their close relationship. Tiffany's employment arrangement was flexible, allowing her to leave if her children were unwell.

11

¶ 54                              7. *Ryan White*

¶ 55    Ryan White (White), Tiffany's father, observed Tiffany and the boys almost daily, as they lived with him. His principal residence was in Florida, and due to his work-related travel, there were periods when he was unable to see them. Tiffany had always served as the primary caretaker for the boys, and White testified that Tiffany was an exceptional parent. White stated that David's drinking escalated following his second deployment.

¶ 56    White stated that the boys have neighborhood friends with whom they ride bikes and scooters, play on trampolines, and play basketball. White testified that before the boys have parenting time with David, they do not want to go. After visiting with David, White said that the boys appeared "sad, they are off balance, they seem guarded with their energy," and required some time to recover. White had never heard Tiffany speak negatively of David.

¶ 57                              8. *Kelly Stephen*

¶ 58    Kelly Stephen, the GAL, testified that she conducted interviews with the parties and the children, and some additional witnesses. She did not visit either party's residence, and she did not visit any of the schools or communicate with the teachers. In response to a question about the witness interviews, she stated:

> "I requested witness lists from both parties early on in my investigation. I received a witness list from [David]. I did not receive one from [Tiffany] until I believe her second meeting with me in middle of February, and that was only because she had asked me if I had met with her witnesses, any of other witnesses, and I said you never provided me a witness list. She got very upset. She had realized that she had only sent it to your office and not to me. I asked her at that point in time—I did not have enough time to meet with a

list of witnesses. I asked her to pick her most important witness that I would squeeze them into my busy schedule. She then picked the ex[-]girlfriend of [David]."

¶ 59 Stephen did not communicate with White despite being aware that Tiffany and the boys lived with him. It was not customary in her practice to engage with the grandparents in every GAL case, and she deemed it unnecessary to do so here. She was not furnished with any information concerning Tiffany's sister until their second meeting. As she did not believe the children had any issues with their academic performance, she relied on the documents the parties provided. She did not interview David's family.

¶ 60 All photographs and text messages from Tiffany were provided to her after she submitted her report. When asked why she discounted an interview with Geist, she stated:

"So in the very beginning when I received Ms. Guise's [*sic*] information from Tiffany, she explained to me that she was filled with drama and that her main concern was that Ms. Guise [*sic*] and Mr. Arnold were sleeping in the bed together with the minor children. So when I started my phone call with Ms. Guise [*sic*] she told me she would have to go after about 30 minutes because she was meeting up with some of Mr. Arnold's other former lovers to have a kind of gab session about him, and so that really kind of worried me that she was still over, quite some time after the end of their relationship was still meeting with other exes of Mr. Arnold to just discuss him. And that given with the comment from Mrs. Arnold about the drama filled, started our conversation, and then how she just kind of came across that she had a list of things that she wanted to talk to me about, and she started the list about all of the other women and their complaints about Mr. Arnold, and I had to stop her and say, no, we are just going talk about things that you personally know. That started kind of lead down the path of this perception of Ms. Guise [*sic*] as just

13

trying to get back at Mr. Arnold and throwing as much kind of negativity my way about Mr. Arnold as possible."

Stephen testified that nothing in Geist's courtroom testimony changed her opinion.

¶ 61    Stephen characterized White's testimony about the children's hesitance to see David as unexpected, because Tiffany told her that the boys wanted to spend more time with David and missed him. Tiffany never informed Stephen that the boys did not want to see David.

¶ 62    Stephen testified that L.R.A. liked the parenting time schedule; but J.D.A. did not. Stephen found no indication that the boys had been coached or brainwashed, contrary to Tiffany's claims.

¶ 63    Stephen noted that David was particularly forthcoming regarding his diagnosis of PTSD. Stephen testified that she tried to talk to Tiffany about her boyfriend's texts to the boys during David's parenting time, but Tiffany could not understand why his actions could be disruptive and inappropriate.

¶ 64    After hearing the testimony during the hearing, Stephen indicated her desire to amend her report to specify that neither party shall consume alcohol when in the presence of the children, and that the boys must wear helmets when riding bicycles, four-wheelers, and ATVs.

¶ 65                                    C. Circuit Court's Ruling

¶ 66    On August 9, 2024, the circuit court verbally issued its parenting time decision stating that it had observed the credibility and demeanor of the witnesses, heard testimony, reviewed exhibits, and considered the applicable statutes. The circuit court analyzed each of the best interest factors. Only those relevant to the issues on appeal will be discussed.

¶ 67    In analyzing the best interest factors for decision-making responsibility, the circuit court observed that the boys lived in Louisiana until May 2022 when Tiffany relocated them to her parents' residence "on the pretense of a visit home to assist her sister in the birth of a child." Since

14

the fall of 2022, the boys had been enrolled in school in Edwardsville where both students performed well academically. L.R.A. was absent for 27 school days, with more than 10 absences classified as unexcused. David expressed a preference for the children to attend school in Mendon, and the circuit court noted that both Edwardsville and Mendon offered comparable educational standards. The children exhibited behavioral challenges and were supposed to be in counseling; however, Tiffany removed them from these services during the summer break. The children did not participate in extracurricular activities, and Tiffany testified that she lacked assistance for those activities. Additionally, Tiffany stated that she spent three to four nights per week at her boyfriend's residence. The children were social, having many friends at both residences. They had trouble transitioning between homes, with L.R.A. becoming physically ill due to his reluctance to leave David's home.

¶ 68     As to the mental and physical health of all individuals, the circuit court discussed David's diagnosis of PTSD for which he took medication. He was attending counseling for his PTSD, but he had not found a therapy that brought him significant relief from his symptoms. Tiffany has had two open-heart surgeries and suffered from migraines. Both parties had substantial alcohol issues.

¶ 69     The circuit court found significant conflict between the parties affecting their ability to cooperate. Tiffany enrolled the children in school in Edwardsville without informing David nor did she disclose the name of the school they were attending. She also failed to inform him about the counselor until the GAL became involved. Tiffany sent a text message to David to "suck her dick," and she also refused David parenting time when he was unable to meet her at her designated time for the exchange of the boys. Additionally, Tiffany refused to provide David with copies of the birth certificates and did not allow David to see the boys for a month. David stated that Tiffany

15

"stole the children" from him within earshot of the boys. The circuit court noted that Tiffany frequently conveyed the phrase "see you in court" via text messages.

¶ 70　Regarding the parents' involvement and prior significant decision-making, the circuit court noted that Tiffany had been the primary caregiver since May 2022. Before that, she was a stay-at-home mother. "She was the one who picked the schools, the pediatrician, the dentist, the counselor." When they lived in Louisiana, David participated in activities such as giving baths, cuddling, preparing meals, and assisting with the children's care.

¶ 71　Regarding previous agreements, the circuit court indicated that temporary orders stipulated that Tiffany was granted a majority of the parenting time; however, it was noted that these orders were issued without prejudice. As to the wishes of the parents, Tiffany desired sole decision-making, while David requested joint. The circuit court noted that the children's needs were being adequately addressed while under the care of both parents. It observed that the children required counseling and consistent school attendance. The distance between the parties' residences was two and a half hours, and the exchanges "have caused significant disagreements."

¶ 72　Regarding the willingness of each parent to foster a close and continuing relationship with the other parent, the circuit court observed that David demonstrated this commitment, whereas Tiffany did not. The circuit court highlighted text messages from Tiffany in which she informed David that she would see him in court or stated that he would not get his parenting time. The circuit court was primarily concerned that Tiffany failed to inform David that she had enrolled the boys in school and failed to provide information about the boys' counselor. The court was concerned that Tiffany kept the boys away from David for one month, and stated:

　　　　"[S]he complained about him not letting her get the kids while they were in Quincy, Illinois, but mom still wanted them moved here from their Louisiana home to here and

16

didn't return and didn't tell dad you were planning on staying. There are texts that say my goal in court is never to have to drive them to you again. The court has considered that."

¶ 73 The circuit court discussed other relevant facts. Tiffany had lived with her parents for two years. Her father was gone for more than half of each year, and her sister lived nearby. The children were not participating in any extracurricular activities due to a lack of assistance. Additionally, Tiffany had not arranged for counseling for the children, despite working only four days a week at a flexible job. David was employed during weekdays, with half-days on Fridays. He had family members in Quincy who could assist with the children, and he had indicated that he could ensure their participation in extracurricular activities.

¶ 74 Tiffany's boyfriend lives in Bethalto, and she spent three to four days per week there with the children. The circuit court noted that the GAL expressed concerns that Tiffany might move to that Bethalto residence. The court was also concerned about the boys' frequent absences from school, suggesting that this could be attributable to Tiffany's frequent nights spent at Hurlbut's residence. It noted that L.R.A. becomes physically ill and expresses a desire to spend additional time with David. It also addressed Hurlbut's text messages to the boys during David's parenting time and stated that such communications were inappropriate.

¶ 75 Regarding David's alcohol consumption, the circuit court noted that if David had been intoxicated to a significant degree, it is unlikely that Tiffany would have permitted him to bathe the children unsupervised. Furthermore, the circuit court noted that Tiffany used to leave the children alone with David when she went out. Finally, the circuit court indicated that the boys were performing well academically, and their physicians were in Edwardsville.

¶ 76    The circuit court then discussed the allocation of parenting time, evaluating the best interest factors. As to the wishes of each parent, Tiffany wanted to have most of the parenting time. David requested equal parenting time.

¶ 77    The circuit court observed that the boys were bonded to both parents. Tiffany informed the GAL that the children wanted to spend additional time with David and they experienced difficulties during transitions from his residence.

¶ 78    The circuit court noted that Tiffany had undertaken the caretaking responsibilities since she moved to Illinois. David was not always involved because Tiffany prevented his participation.

¶ 79    The circuit court acknowledged the DCFS investigation, noted that it was unfounded, and indicated that the boys needed to be in counseling. The boys loved their parents and had a lot of family. Hurlbut was also close with them, but the circuit court again expressed concerns regarding his texts to the boys while they were with David.

¶ 80    The circuit court stated that it agreed with the GAL about Geist's testimony and did not place significant weight on her testimony. The court was not troubled by David's PTSD, as he was actively addressing it through counseling. However, the court was concerned about both parties' alcohol consumption.

¶ 81    The circuit court observed that both parents were deficient in prioritizing the needs of the children over their own. Comments made by Tiffany to David, indicating that he must meet her at 2:00 to pick up the children or face court proceedings, were characterized by the court as "a game." The court also noted:

        "Taking these children out of Louisiana and enrolling them in Edwardsville and not

            telling dad where their school was is unacceptable. I think some of the testimony was, well,

            dad can figure that out on his own. He can call the schools or it's not my job to tell him

18

things. I understand that, but enrolling two kids in schools that you share together, obviously that would have been really important to tell dad. I think my GAL found a lot of problems with that also.

Putting them in counseling and not telling dad is also unacceptable. I saw the texts that were admitted into evidence regarding that. Alcohol usage is a problem. Not letting the other parent see the children is a problem.

These kids are so upset about leaving dad they miss school on Monday according to mom's testimony and comments to the GAL, and the kids not being involved in any activities for two years when you have a flexible schedule is something the court has to consider."

¶ 82 The circuit court ruled that it was in the children's best interests for the parties to share decision-making responsibilities in all four areas. David's address was to be used for school purposes, and it was in the best interests of the children for David to have parenting time during the school year. If Tiffany moved to Mendon, the circuit court would award a week-to-week schedule. The distance between the parties was created by Tiffany "unilaterally moving up here without consent, so the children have to live somewhere." Tiffany was awarded parenting time the first, second, and fourth weekend of every month and the parties were to split school breaks and alternate holidays. The summer schedule would be week to week, but the parents had to take them to activities during their time.

¶ 83 The circuit court imposed several restrictions on the parties. Neither party was to consume alcohol while the children were under his or her supervision. The boys were not to be left unattended with David's nephew. Both parties were prohibited from disparaging the other parent or permitting others to do so in the presence of the children. Hurlbut was instructed not to initiate

19

communication with the boys during David's parenting time. L.R.A. was to be given his medication daily, and the children were required to wear helmets when riding bicycles, four-wheelers, and ATVs.

¶ 84                                    D. Posttrial Pleadings

¶ 85     On November 8, 2024, David filed a motion asking the court to enter his written judgment order and a parenting plan in compliance with the circuit court's ruling. Although requested, Tiffany provided no comments concerning potential modifications or errors. David accordingly requested that the draft order be entered. Subsequently, on November 19, 2024, the circuit court entered the supplemental judgment of dissolution of marriage and the associated parenting plan.

¶ 86     On December 19, 2024, Tiffany filed a motion seeking relief from the circuit court's November 19, 2024, judgment contending that the court's ruling on decision-making responsibilities and parenting time was contrary to the manifest weight of the evidence. In support, she argued that the GAL's report, "was the product of an incomplete investigation". She requested that the supplemental judgment be vacated and that the temporary parenting order be reinstated. On January 22, 2025, the court denied Tiffany's motion.

¶ 87     On April 16, 2025, the circuit court entered a child support order awarding David $359.08 every other week beginning April 30, 2025. Thereafter, on May 15, 2025, Tiffany timely filed her notice of appeal.

¶ 88                                         II. ANALYSIS

¶ 89     On appeal, Tiffany contends that the GAL failed to fulfill her basic duties, including not visiting the children's school or communicating with their teachers, not consulting with the children's counselor, not interviewing her family or her employer, and not inspecting the parties' residences. She maintains that David's alcohol consumption is a significant concern that the GAL

did not sufficiently investigate. Tiffany asserts that the GAL did not carry out the minimum requirements mandated by Illinois Supreme Court Rule 907 (eff. Mar. 8, 2016). Additionally, she argues that the circuit court's decision concerning the allocation of parenting time and decision-making was against the manifest weight of the evidence, asserting that an evaluation of the best interest factors favors her position. She asks this Court to reverse the circuit court's judgment and to remand the case for further proceedings.

¶ 90    In response, David contends that the GAL fulfilled her obligations as required by Rule 907. She met with the children and interviewed the parties on multiple occasions. The issue of PTSD was raised by Tiffany and David provided his medical records to the GAL. Neither party raised an issue regarding the other's living arrangements, so there was no need to visit the homes. Tiffany never provided a list of witnesses to the GAL, while David did. David contends that the circuit court's decision was not against the manifest weight of the evidence. He highlights the circuit court's detailed analysis of the best interest factors, concentrating on several, including the parties' inability to cooperate and Tiffany's unwillingness to facilitate and encourage a relationship with David. He argues:

> "[T]he court did not blindly rely on the [GAL] rather the court made its own findings of facts based upon the testimony it observed over two days of trial. The fact that the court accepted the [GAL]'s recommendation does not mean that the court somehow surrendered its obligation to waive [*sic*] the evidence before it and make appropriate determinations."

David asks this court to affirm the circuit court's order.

¶ 91                           A. The GAL Report

¶ 92    Tiffany argues that Stephen did not conduct a thorough investigation and that her report was insufficient. Rule 907 states in part that a GAL shall "take whatever reasonable steps are

21

necessary to obtain all information pertaining to issues affecting the child, including interviewing family members and others possessing special knowledge of the child's circumstances." Ill. S. Ct. R. 907(c) (eff. Mar. 8, 2016). Here, Stephen performed her duties in compliance with this Rule and her report reflected her thorough investigation. Stephen engaged in multiple discussions with the parents and the children. She communicated with one of David's family friends, as well as with Geist, whom Tiffany requested. She examined emails, text messages, screenshots, and videos provided by the parties. Additionally, she reviewed David's discovery materials and the boys' school records. Finally, she reviewed the boys' interviews about the unfounded DCFS investigation. Her report included a detailed analysis of each best interest factor. The GAL made her recommendations based on her consideration of the best interests factors and her investigation. Nonetheless, Tiffany raises concerns regarding the report, complaining that Stephen did not visit the boys' schools, speak with their teachers, visit the parents' residences, or interview her family members. We find that such actions were not necessary.

¶ 93    First, the boys were performing well academically, and there were no issues concerning their scholastic progress. During the hearing, when questioned about this matter, Stephen stated: "If I thought there was a genuine problem I would have then met with the teachers, but I did not believe there was a significant problem with performance at the school, and so instead I just utilized the documents that were provided to me by the parties."

¶ 94    Tiffany's assertion that the teachers' interviews were a crucial element missing from the GAL report cannot be reconciled with the fact that Tiffany herself chose not to call any teachers or administrators from the Edwardsville school district to testify at the hearing. To the extent that obtaining information from these individuals was essential, as Tiffany had already received the GAL report and was aware that teachers and/or administrators had not been interviewed by the

GAL, Tiffany had ample opportunity to subpoena any of these individuals as witnesses. Nonetheless, she chose not to do so.

¶ 95    Additionally, the boys had accumulated an alarming number of school absences for which Tiffany had no explanation. The GAL examined the truancy correspondence and the attendance records maintained by the school. The GAL would not have discovered the reasons for the absences by speaking with school administrators because Tiffany never informed the school of the reasons for the absences.

¶ 96    Second, the GAL was not required to conduct home visits as the condition of the parties' residences and living conditions was not raised as an issue by either party.

¶ 97    Finally, Tiffany asserts that the report was incomplete because none of her witnesses were interviewed. However, the GAL testified that she requested a witness list from both parties at an early stage of the investigation, and Tiffany failed to provide one. The GAL allowed Tiffany to submit a list late in the investigation, but because the GAL's report was due within the week, she asked Tiffany to select the most important witness. Tiffany selected Geist. The GAL contacted, interviewed, and included Geist's statements in the report.

¶ 98    Tiffany cites *In re Marriage of Gualandi*, 2024 IL App (5th) 240238, to support her argument that the GAL failed "to take reasonable steps to obtain all information pertaining to issues affecting the children." In that case, we vacated the circuit court's judgment, which modified parenting time in part because the GAL did not thoroughly investigate the matter in accordance with the best interest factors. *Id.* ¶ 89. However, *Gualandi* is factually distinguishable. In *Gualandi*, the GAL testified concerning issues that were not brought to her attention before the submission of the GAL report. *Id.* ¶ 88. The report itself did not adequately address the best interest factors and lacked any information regarding "any prior agreement or course of conduct between

23

the parties." *Id.* ¶ 87. Additionally, issues concerning the appellee's living environment, which was described as unstable, were not investigated. *Id.* ¶ 82. One child was struggling academically, for unclear reasons, and no teachers were interviewed. *Id.* ¶ 83. The failure of the GAL in *Gualandi* to investigate these particular issues distinguishes that case from this case.

¶ 99   Tiffany argues that the GAL failed to thoroughly investigate David's alcohol consumption by not interviewing her father and sister. However, both of these individuals testified, and Tiffany had ample opportunity to ask questions about David's drinking habits during his testimony.

¶ 100   The GAL detailed her interviews thoroughly and provided an appropriate analysis of the best interest factors based on the information she received. She took sufficient steps necessary "to obtain all information pertaining to issues affecting the child." Ill. St. Ct. R. 907(c) (eff. Mar. 8, 2016). Her report and testimony served as the " 'eyes and ears of the court.' " *Nichols v. Fahrenkamp*, 2019 IL 123990, ¶ 46 (quoting *In re Mark W.*, 228 Ill. 2d 365, 374 2008)). The circuit court was best positioned to evaluate the credibility of witnesses, including the GAL. It concluded that her report was comprehensive and opted to follow her recommendations.

¶ 101   Having thoroughly reviewed the record on appeal, including the GAL's report and testimony, we find that the GAL amply complied with Rule 907. Tiffany's claims to the contrary are meritless.

¶ 102                               B. Parenting time

¶ 103   Tiffany next contends that the parenting time allocation was against the manifest weight of the evidence. Section 602.7 of the Illinois Marriage and Dissolution of Marriage Act provides: "The court shall allocate parenting time according to the child's best interests." 750 ILCS 5/602.7(a) (West 2022). "In determining the child's best interests for purposes of allocating

parenting time, the court shall consider all relevant factors." *Id.* § 602.7(b). The relevant factors for the court to consider include, but are not limited to, the following:

"(1) the wishes of each parent seeking parenting time;

(2) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to parenting time;

(3) the amount of time each parent spent performing caretaking functions with respect to the child in the 24 months preceding the filing of any petition for allocation of parental responsibilities ***;

(4) any prior agreement or course of conduct between the parents relating to caretaking functions with respect to the child;

(5) the interaction and interrelationship of the child with his or her parents and siblings and with any other person who may significantly affect the child's best interests;

(6) the child's adjustment to his or her home, school, and community;

(7) the mental and physical health of all individuals involved;

(8) the child's needs;

(9) the distance between the parents' residences, the cost and difficulty of transporting the child, each parent's and the child's daily schedules, and the ability of the parents to cooperate in the arrangement;

(10) whether a restriction on parenting time is appropriate;

(11) the physical violence or threat of physical violence by the child's parent directed against the child or other member of the child's household;

(12) the willingness and ability of each parent to place the needs of the child ahead of his or her own needs;

(13) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child;

(14) the occurrence of abuse against the child or other member of the child's household;

(15) whether one of the parents is a convicted sex offender or lives with a convicted sex offender and, if so, the exact nature of the offense and what if any treatment the offender has successfully participated in; the parties are entitled to a hearing on the issues raised in this paragraph (15);

(16) the terms of a parent's military family-care plan that a parent must complete before deployment if a parent is a member of the United States Armed Forces who is being deployed; and

(17) any other factor that the court expressly finds to be relevant." *Id.* § 602.7(b)(1)-(17).

¶ 104 " '[T]he best interests of the child is the "guiding star" by which all matters affecting children must be decided.' " *Smith v. Small*, 2022 IL App (4th) 220057-U, ¶ 40 (quoting *In re Parentage of J.W.*, 2013 IL 114817, ¶ 41.) " 'A trial court's findings as to a child's best interest are entitled to great deference because the trial judge is in a better position than we are to observe the personalities and temperaments of the parties and assess the credibility of the witnesses.' " *Id.* (quoting *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21). We will not reverse a circuit court's best-interests determination unless it is against the manifest weight of the evidence. *Id.* " 'A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence.' " *Id.* (quoting *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61 (2009)).

¶ 105 Tiffany's argument that the circuit court's decision was contrary to the manifest weight of the evidence because it relied on an inadequate GAL report fails for the following reasons.

¶ 106 First, Tiffany argues that the evidence favored awarding her the majority of parenting time. We find that the circuit court thoroughly articulated and analyzed each best interest factor. Tiffany unilaterally transported the children from Louisiana to Illinois under the pretense of assisting with her sister's pregnancy. David was unaware that Tiffany did not plan to return. He testified that the parties frequently visited Illinois, and therefore, this trip was not unusual. However, the manner and method in which Tiffany transported the children to Illinois was surreptitious and likely escalated the trust issues between the parties.

¶ 107 Second, Tiffany enrolled the children in an Edwardsville school without David's knowledge. She chose to do so independently, disregarding David's rights as the boys' father. She did not inform him of the school they were attending. The circuit court addressed this matter by stating:

"Taking these children out of Louisiana and enrolling them in Edwardsville and not telling dad where their school was is unacceptable. I think some of the testimony was, well, dad can figure that out on his own. He can call the schools or it's not my job to tell him things. I understand that, but enrolling two kids in schools that you share together, obviously that would have been really important to tell dad."

¶ 108 Third, Tiffany did not inform David that the boys were in counseling. He only learned of the counseling sessions because these appointments were routinely scheduled during his parenting time. It can be inferred that the scheduling of these appointments during David's designated parenting days was done intentionally. Furthermore, when David requested information regarding the counselor's identity, Tiffany refused to tell him.

27

¶ 109    Fourth, Tiffany acknowledged that she became angry with David for calling the police following an exchange in which he believed she was under the influence of drugs. Consequently, she penalized him by prohibiting him from seeing the children for an entire month. On another occasion, she became upset with David and refused to allow the boys to speak to him on the phone; at times, she would also block David from L.R.A.'s phone.

¶ 110    Conversely, David relocated to Illinois to be closer to the children. He undertook the responsibility of researching schools in Mendon, exploring available extracurricular activities, and investigating travel soccer programs in the Quincy area. He engaged with local educators and coaches and had numerous individuals available to assist with transportation. The circuit court observed that the children were also adjusted to David's residence during visits and that they had friends in Mendon. The evidence clearly indicated that the boys wanted to see David more frequently and exhibited signs of sadness when his parenting time ended. L.R.A. experiences physical distress, including vomiting, after leaving his father. These physical manifestations provide significant insight. Furthermore, regarding his personal conduct, David acknowledged past excessive alcohol consumption during his residence in Louisiana; however, he testified that he has substantially reduced his intake. He openly discussed his diagnosis of PTSD and, rather than abandoning therapy that he finds ineffective, he is actively seeking alternative treatments. He is presently following his prescribed medication regimen for PTSD, demonstrating a responsible approach to managing his condition rather than neglecting it.

¶ 111    The circuit court heard two days of testimony and was very familiar with these parties. " 'It is a well-established rule that the credibility of witnesses should be left to the trier of fact because it alone is in the position to see the witnesses, observe their demeanor, and assess the relative credibility of witnesses where there is conflicting testimony on issues of fact.' " *In re Marriage of*

28

*Whitehead*, 2018 IL App (5th) 170380, ¶ 21 (quoting *In re Marriage of Kaplan*, 149 Ill. App. 3d 23, 28 (1986)); *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. The circuit court's ruling was not unreasonable or arbitrary and was fully supported by the testimony it heard. We find that the court's parenting time allocation was not against the manifest weight of the evidence. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶ 21.

¶ 112                                C. Parental Responsibilities

¶ 113    The circuit court granted joint decision-making authority concerning all four parental responsibilities. On appeal, Tiffany does not address this aspect of the judgment in her brief, as her argument solely pertains to the best interest factors relevant to parenting time. She fails to discuss the best interest factors relevant to parental responsibilities and has provided no argument on this issue. Matters not argued on appeal are deemed forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Therefore, we will not address this portion of the circuit court's judgment.

¶ 114                                III. CONCLUSION

¶ 115    For the foregoing reasons, we affirm the judgment of the Madison County circuit court.

¶ 116    Affirmed.